RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0131P (6th Cir.)
File Name: 02a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

MONTEL LAVELLE
HUMPHREY,
    *Defendant-Appellant.*

No. 99-3374

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 97-00186—Patricia A. Gaughan, District Judge.

Argued: August 8, 2001

Decided and Filed: April 17, 2002

Before: MOORE and COLE, Circuit Judges; ROSEN,
District Judge.

_____

**COUNSEL**

**ARGUED:** Michael J. Benza, Cleveland, Ohio, for
Appellant. Ronald B. Bakeman, ASSISTANT UNITED

---

    *The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

1

STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, Cleveland, Ohio, for Appellant. Ronald B. Bakeman, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

COLE, J., delivered the opinion of the court, in which MOORE, J., joined. ROSEN, D. J. (pp. 48-85), delivered a separate opinion concurring in part and dissenting in part.

———————

## OPINION

———————

R. GUY COLE, JR., Circuit Judge.

## I. INTRODUCTION

Montel L. Humphrey appeals his conviction and sentence for conspiring to possess with intent to distribute cocaine, possession of a firearm after a prior felony conviction, and conspiring to commit money laundering. Humphrey assigns six points of error: (1) the Government relied on incompetent evidence and argument at trial and improperly used its peremptory challenges to exclude African-Americans from the jury; (2) the district court failed to examine a conflict of interest raised by trial counsel prior to sentencing and failed to conduct a proper inquiry into Humphrey's *Batson* challenge raised during the course of voir dire; (3) the jury instructions failed to properly guide the jury in its consideration of the multiple conspiracies alleged in this case, failed to ensure jury unanimity on elements of the offense, and failed to direct the jury to determine the type of drugs sold by Humphrey; (4) the district court violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), when it failed to instruct the jury to find drug quantities beyond a reasonable doubt; (5) Humphrey's trial counsel failed to provide effective assistance, because counsel failed to raise a timely *Batson* challenge, operated under a conflict of interest, failed to argue for or present a mitigation argument in support of a downward departure, and failed to object to Government

misconduct at critical stages of trial; and (6) the Government's plea agreements with alleged co-conspirators Henry Eaton and Tyrone Cromity, pursuant to which both were "paid" for their testimony, violated the express terms of 18 U.S.C. § 201(c)(2) and Disciplinary Rule 7-109(c) of the Ohio Code of Professional Responsibility.

For the reasons that follow, we **AFFIRM** the judgment of the district court with the exception of the sentence. Because the district court's drug quantity finding resulted in an enhanced statutory penalty, we conclude that Humphrey's sentence violated the Supreme Court's rule established in *Apprendi v. New Jersey*. We accordingly **VACATE** Humphrey's sentence and **REMAND** this case to the district court for resentencing.

## II. BACKGROUND

The Caribbean Gang Task Force ("Task Force") of the Shaker Heights, Ohio, Police Department conducted an eighteen month investigation into the drug-distribution activities of Henry Eaton and Tyrone Cromity. Over the course of this investigation, the Government made controlled buys from both individuals and intercepted phone calls and pages made by them to Montel Humphrey. The Task Force never made any controlled buys from Humphrey, never witnessed any drug deals involving Humphrey, and never observed drugs in Humphrey's possession. It nevertheless secured sufficient evidence to execute search and arrest warrants on June 3, 1997, on numerous individuals and locations, including Humphrey and his property. This search revealed no drugs or drug paraphernalia in Humphrey's possession. On July 1, 1997, a federal grand jury in the Northern District of Ohio returned a superseding indictment against Humphrey and fourteen other individuals, charging violations of federal narcotics, firearms, and money laundering laws. The Government entered into plea agreements with all defendants except Humphrey and Darryl Morrow, both of whom proceeded to trial before Judge Sam H. Bell on June 9, 1998.

Testimony at trial revealed that Eaton first met Humphrey in Alabama in September 1996. Thereafter, Eaton allegedly met Humphrey in Cleveland, Ohio, where Humphrey discussed supplying Eaton with cocaine. Eaton received approximately one-eighth of a kilogram of cocaine from Humphrey as a result of that conversation and continued to receive periodic shipments of cocaine from Humphrey until March 1997. From September 1996 through March 1997, Humphrey distributed cocaine to Eaton "approximately ten to twelve times." Eaton also testified that he and Humphrey communicated with each other by telephone and pager using predetermined codes.

Task Force member and Shaker Heights, Ohio, Detective Marvin LaMielle testified that from January 25, 1997, through June 4, 1997, the Task Force undertook court-authorized interceptions of electronic and wire communications between Humphrey and other individuals under investigation. LaMielle also testified that he obtained Humphrey's cellular telephone records, which, in conjunction with the intercepted communications, revealed that shortly after Eaton would arrange the sale of cocaine to third parties, Eaton would page Humphrey with the appropriate codes, ostensibly to purchase some quantity of cocaine.

Cromity testified that he met Humphrey sometime in 1992 or 1993 and that their first drug transaction occurred in November 1996. Cromity stated that on this occasion he paged Humphrey and entered his home telephone number, the appropriate code to identify himself as the caller, and the amount of money he had to purchase cocaine. The two subsequently met, whereupon Humphrey allegedly sold Cromity one-half kilogram of cocaine for $8,000. Cromity also testified that Humphrey continued to supply him with drugs through February 1997, during which time he received "probably between seven and nine" kilograms of cocaine. Humphrey's phone records, coupled with information intercepted from Humphrey's pager, indicated that on more than one occasion Cromity paged Humphrey seeking to

majority's disposition of Defendant's *Apprendi* claim, and from its decision to remand this case for resentencing.[25]

---

[25]I do not understand the majority's confusion as to the outcome I am advocating in this case. Specifically, I believe that Defendant's *Apprendi* challenge should be rejected, and his sentence affirmed in all respects. As authority for this, I would look to *Page*, *Munoz*, and our other initial post-*Apprendi* rulings that I have surveyed above. To the extent that this approach requires us to "ignore" certain of our published decisions, this is by no means unprecedented. Rather, as I observed at the outset, we have adopted a rule to govern this precise situation, requiring that we adhere to our first published ruling on a subject over a later but conflicting decision. *See Darrah*, *supra*, 255 F.3d at 310.

In contrast, it is interesting to consider what might occur upon the remand ordered by the majority. At his initial sentencing, Defendant faced a Sentencing Guidelines range of 235 to 293 months, and the majority finds no error in this determination. On remand, then, Defendant stands to achieve at most a 5-month reduction in his sentence. Yet, his sentence also could be *enhanced*, since, as the majority points out, our post-*Apprendi* jurisprudence permits the imposition of a sentence that exceeds but does not equal an enhanced statutory minimum, so long as it does not exceed the default statutory maximum under § 841(b)(1)(C) — in this case, 30 years. *See King*, 272 F.3d at 377-78.

In the end, I take *Page* to mean what it literally says, no more and no less. A defendant who "fail[s] to object to the district judge making the determination of drug quantities" faces plain error review of his *Apprendi* claim on appeal. *Page*, 232 F.3d at 543. To be sure, there can be cases falling at the margins of this rule and, as the majority points out, we require no particular "magic words" to preserve an *Apprendi*-based challenge. Yet, in my view, this case lies nowhere near any grey area in *Page*'s rule. Defendant not only failed to object to the District Judge making the determination of drug quantities by a preponderance of the evidence, he expressly agreed that this procedure governed his sentencing, and he framed his objections accordingly, inviting the District Court, in its role as factfinder, to discount the Government's evidence of drug quantities as unreliable. On this record, I think it clear that Defendant's present *Apprendi* claim should be reviewed only for plain error.

## III.

The majority's decision to remand this case for resentencing rests upon two underlying determinations: (i) that the rule of *Apprendi* is violated whenever a District Court's factual finding by a preponderance of the evidence alters the range of penalties to which a defendant is exposed; and (ii) that *Apprendi* claims are reviewed *de novo* whenever a defendant raises any sort of challenge at sentencing to the District Court's factual findings as to drug quantity. Both of these underlying propositions, I believe, are demonstrably in error, whether one proceeds by first principles from the relevant Supreme Court precedents, or whether one simply reviews the initial (and presumably still binding) Sixth Circuit precedents on each of these points. Accordingly, while I concur in all other respects, I respectfully dissent from the

purchase cocaine from him, after which Humphrey called Cromity to make payment arrangements.

On June 22, 1998, a jury acquitted Morrow of all counts. Humphrey, however, was convicted of conspiring to distribute cocaine (Counts One and Two), unlawful possession of a firearm by a previously convicted felon (Count Twelve), and conspiring to commit money laundering (Count Seventeen); he was acquitted of two substantive money laundering counts (Counts Eighteen and Nineteen). On March 10, 1999, the district court denied Humphrey's post-trial motions for a *Franks* hearing[1] and a new trial and his motion to set aside his state conviction for sentencing purposes. At Humphrey's request, Judge Bell recused himself on September 8, 1998; the case was then transferred to Judge Patricia A. Gaughan.

David Dudley, Humphrey's counsel, raised a possible conflict of interest shortly before Humphrey's scheduled sentencing. The government filed a motion requesting that the district court consult with Humphrey and Dudley regarding Dudley's continued representation of Humphrey. The district court reviewed a transcript of an earlier hearing held before Judge Bell on this issue and concluded that no additional inquiry was warranted. On March 10, 1999, the district court sentenced Humphrey to a mandatory 240-month term of imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A), a ten-year period of supervised release, a $25,000 fine, and a $400 special assessment. This timely appeal followed.

---

[1] A defendant is entitled to a hearing to challenge the validity of a search warrant if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

## III. DISCUSSION

### A. Government Misconduct

### 1. Standard of Review

Where a defendant fails to raise an objection before the district court, "a court of appeals [has] a limited power to correct errors that were forfeited because [they were] not timely raised in district court." *United States v. Olano*, 507 U.S. 725, 731 (1993). Indeed, we will notice such an error only in "exceptional circumstances" or when the failure to do so would produce a "plain miscarriage of justice." *See United States v. Pickett*, 941 F.2d 411, 415 (6th Cir. 1991).

We have developed a four-part analysis to review forfeited claims. We consider first whether there was error. *United States v. Vincent*, 20 F.3d 229, 234 (6th Cir. 1994). If there was error, then we determine if the error was plain. *Id.* If the error was plain, we next decide whether the error affected the defendant's substantial rights. *Id.* Finally, we consider whether the error seriously affected the "fairness, integrity, or public reputation" of the judicial proceedings. *Id.* Only upon such a finding may we then exercise our discretionary authority to notice the error. *See id.*

Preserved objections to a district court's evidentiary decisions are reviewed for abuse of discretion. We will only reverse if the decision caused more than a harmless error. *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994)

### 2. Analysis

Humphrey argues that the Government's misconduct at trial deprived him of his right against self-incrimination, as well as his rights to a fair trial, an unbiased jury, and due process of law. Specifically, Humphrey alleges: (1) that the Government improperly shifted the burden of proof to him by suggesting to the jury that Humphrey's unexplained wealth demonstrated his participation in narcotics and money laundering activities;

defendant who does not "object to the **district judge making the determination** of drug quantities" faces plain error review on appeal. *Page*, 232 F.3d at 543 (emphasis added). The Court's failure to expressly catalog each and every objection that *was* made at sentencing in that case, and to explain why each did not operate to preserve the defendants' *Apprendi* challenges, does not in any way diminish the force of *Page*'s express holding. Nor does it afford any opportunity, in my view, for a later panel to seize upon *Page*'s silence as a basis for drawing a distinction which, as a matter of brute fact, might not even exist, and, as a matter of judicial interpretation, must have lacked legal significance to the Court in that case.[24]

---

[24] As noted earlier, the distinction *Strayhorn* seeks to draw between the circumstances presented in that case and the circumstances in *Neuhausser* does not, in fact, exist. Thus, we are in the same predicament in our post-*Apprendi* standard of review jurisprudence as I discussed earlier with regard to our decisions addressing the substantive scope of *Apprendi*: namely, that like cases are being decided differently, with *Strayhorn* having effectively overruled *Neuhausser*, at least (and arguably also *Page*), on the standard of review issue. And, again, any effort to identify a coherent statement of our Circuit's present rule on this issue runs afoul of the case law, where many of our recent decisions continue to cite *Page* as authority for applying a plain error standard, without ever considering whether a factual challenge at sentencing might instead trigger *de novo* review. *See, e.g., United States v. Graham*, 2001 WL 1667289, at *2 (6th Cir. Dec. 21, 2001); *United States v. Martin*, 2001 WL 1631410, at *2 (6th Cir. Dec. 18, 2001); *McLemore, supra*, 2001 WL 1563652, at *3; *King, supra*, 272 F.3d at 374; *United States v. DePaz*, 2001 WL 1450805, at *3 (6th Cir. Oct. 29, 2001); *Arbelaez-Agudelo, supra*, 2001 WL 1042249, at *3 n.2; *Cook, supra*, 2001 WL 777404, at *5; *Martinez, supra*, 253 F.3d at 255; *United States v. Taylor*, 2001 WL 549417, at *5 (6th Cir. May 16, 2001). Indeed, a review of these decisions reveals that some of the defendants *did* raise factual objections to the sentencing judge's determinations, and yet we still applied plain error review. *See Graham*, 2001 WL 1667289, at *2; *McLemore*, 2001 WL 1563652, at *2-*3; *King*, 272 F.3d at 375, 378; *DePaz*, 2001 WL 1450805, at *2-*3; *Arbelaez-Agudelo*, 2001 WL 1042249, at *3 & n.2. These cases, like *Neuhausser*, are in direct conflict with *Strayhorn*'s rule of *de novo* review. Again, I would suggest that the Supreme Court, through its decision in *Johnson*, should serve as the "tiebreaker" in resolving this conflict.

Next, even assuming the factual distinctions posited in *Strayhorn* actually existed, I fail to see how a *fact-based* objection to a sentencing judge's drug quantity computation could properly be construed as preserving the far different sort of challenge that arises from *Apprendi* — namely, a legal challenge implicating the division of labor between judge and jury, as well as the stringent "beyond a reasonable doubt" burden of proof attendant to a jury-submissible issue. The record in this case amply demonstrates the distinction between factual and *Apprendi*-based objections to a District Court's determination of drug quantities — Defendant here quite plainly asserted the former type of objection at sentencing, but expressly disavowed any claim of the latter sort, and instead acknowledged the District Court's authority to make such a determination by a preponderance of the evidence. It would be strange indeed if a defendant's challenge to a District Court's factual findings, which we review for clear error, *see Neuhausser*, 241 F.3d at 475, somehow triggered *de novo* review of a *different* sort of challenge that was *not* presented to the sentencing court. And, again, *Strayhorn* stands alone in its failure to observe this distinction; several other Circuits, in contrast, have expressly held that the plain error standard applies even where there were factual objections to the sentencing court's determination of drug quantities. *See, e.g., Fields*, 251 F.3d at 1044-45; *Mojica-Baez*, 229 F.3d at 306 & n.8; *Nordby*, 225 F.3d at 1056-57, 1060.

Indeed, I read *Page* as our Circuit's definitive statement on the subject, leaving no room for the distinction that *Strayhorn* seeks to draw. *Page* does not say much on the subject — we seldom do when setting forth the applicable standard of review — but what it says is plain enough: namely, that a

---

the defendant *did* present factual challenges to the District Judge's determination of drug quantities, both in written objections to the presentence report and at his sentencing hearing. As indicated below, if this portion of the record was not mentioned in the panel's opinion, it was because we deemed it irrelevant to either the issues before the Court or the standard of review to be applied in resolving those issues.

(2) that the Government improperly used Humphrey's income tax returns and the testimony of an Internal Revenue Service ("IRS") agent to suggest that Humphrey's commission of an unindicted crime, tax evasion, was evidence of guilt; (3) that the prosecutor improperly vouched for his witness and stated his personal belief in Humphrey's guilt; (4) that the Government improperly exercised its peremptory challenges to exclude African- Americans from the jury;[2] (5) that the Government argued facts not in evidence; (6) that the Government confused the jury by misstating the definition of a "buyer-seller relationship"; (7) that the Government intentionally submitted irrelevant evidence to the jury and prevented a fair rebuttal by Humphrey of that evidence; (8) that the Government improperly argued that Humphrey's counsel knew that his client was guilty; and (9) that the cumulative impact of each of the aforementioned instances of misconduct is sufficient to warrant reversal. Each argument will be addressed in turn. All ultimately fail.

### a. Unexplained Wealth

Humphrey submits that the Government's case against him was predicated on the self-serving testimony of Eaton and Cromity, both admitted drug dealers, and on testimony that insinuated a young African-American male is incapable of operating a successful business unless he is engaged in illegal narcotics activity. To drive home this point, Humphrey contends that the Government relied improperly on evidence of Humphrey's unexplained wealth, in contravention of his Fifth Amendment right against self-incrimination, to suggest that because Humphrey had failed to identify the source of his wealth, then he necessarily must have been guilty of drug trafficking.

Humphrey maintains that in making such an argument, the Government improperly shifted its burden of proof to him,

---

[2]The Government's alleged use of its peremptory challenges to exclude African-Americans from the jury and the district court's failure to so find are addressed in Part III.B.2.b.

which was especially prejudicial in light of the fact that the only evidence linking him to illegal drug activity was the testimony of Eaton and Cromity. In fact, Humphrey notes, the Government never observed drugs in his possession or his residences, never discovered large sums of cash in his possession, never witnessed him engage in drug activity, and never attempted to coordinate a controlled drug buy from him. Humphrey objected to the admission of tax evidence, J.A. at 299; therefore, we review the district court's decision for an abuse of discretion.

In *United States v. Carter*, we rejected as irrelevant the Government's use of financial information in its prosecution of a defendant for violation of federal narcotics laws. 969 F.2d 197, 200 (6th Cir. 1992). We nevertheless observed that evidence of "the lack of a federal tax filing (or underreporting) in combination with proof of valuable tangible possessions or extravagant purchases creates the inference that the defendant does not possess a legitimate source of income to support his affluent lifestyle and, therefore, the income must originate from narcotics operations," *id.* at 201, and that "there are cases that allow the government to use a defendant's tax returns and evidence of his spending habits in order to obtain a conviction in a narcotics case." *Id.*

Before us is such a case. There was unrebutted testimony at trial that Humphrey's total expenditures for 1996 and 1997 amounted to $454,880.27, despite the fact that he had been "unemployed the past eight months" due to a disability. It was well within the prerogative of the Government to encourage the jury to consider how Humphrey maintained this affluent lifestyle, particularly in light of the declarations of the district court and the Government that the burden of proof at all times remained with the Government. The Government's closing and rebuttal arguments were entirely proper comments on the quality and credibility of Humphrey's evidence.

district court's factual finding with respect to drug quantity." *Strayhorn*, 250 F.3d at 467. The panel contrasted this with the situation presented in *Page*, where the defendants purportedly "failed to object when [the] district court made its determination of drug quantities." *Strayhorn*, 250 F.3d at 467.

This attempted distinction, however, fails on at least two scores. First, as a factual matter, and as both the majority and I have pointed out in our respective opinions, *Page* says almost *nothing at all* about what objections, if any, were presented to the District Court in that case. The lone break from this silence, as I noted earlier, is the Court's pointed observation that the defendants "did not object to the district court making the determination of drug quantities." *Page*, 232 F.3d at 543. For all we know, then, the defendants in *Page* raised precisely the same sorts of factual challenges to the District Court's drug quantity determinations as were made in *Strayhorn*.[23]

---

[23] *Strayhorn* commits the same error with respect to our decision in *Neuhausser*, viewing that case, like *Page*, as distinguishable on the ground that the defendant purportedly "failed to object when [the] district court made its determination of drug quantities." *Strayhorn*, 250 F.3d at 467 (citing *Neuhausser*, 241 F.3d at 466). In fact, *Neuhausser* states at the outset that the defendant was challenging his sentence as "unlawfully based in part on the trial court's determinations of drug types and quantities at sentencing under the 'preponderance of the evidence' standard," and that, because the defendant "failed to raise **this objection** in the court below, we review his sentence only for plain error." 241 F.3d at 464 (emphasis added). Then, in the passage cited in *Strayhorn*, *Neuhausser* surveys the decision in *Page*, and states that "in *Page*, as here, the defendants failed to object when the District Court initially made its determination of drug quantities." *Neuhausser*, 241 F.3d at 466. From the context, as well as the reference to *Page*, it is evident that *Neuhausser* is speaking of a *particular* "fail[ure] to object" — namely, the lack of any objection that drug type and quantity must be determined by a jury beyond a reasonable doubt, and not by a judge by a preponderance of the evidence. *Neuhausser*, like *Page* is utterly silent as to whether any other sorts of objections were raised at trial or sentencing.

Parenthetically, as a member of the panel (and the writing Judge) in *Neuhausser*, I am able to go back to the record and confirm that, in fact,

(6th Cir. 1993).[22] *Lloyd*, however, applied the *de novo* standard to facial attacks on the constitutionality of a federal statute — specifically, equal protection and substantive due process challenges to the statutory 100-to-1 sentencing disparity under § 841(b) for drug offenses involving crack versus powder cocaine. Such questions of law, implicating the scope of congressional authority under the Constitution, clearly warrant *de novo* review.

In contrast, Defendant here has not mounted a constitutional attack upon a federal statute, but instead challenges the District Court's decision as to which elements of a drug conspiracy offense must be submitted to the jury for determination beyond a reasonable doubt, and which may be determined by the Court at sentencing by a preponderance of the evidence. This, of course, was the very sort of challenge presented to us in *Page*, and to the Supreme Court in *Johnson*, and the courts in both cases determined that the plain error standard governed their inquiries, where the defendants had not raised their arguments in the lower court proceedings. Remarkably, *Strayhorn* even cites *Page*, and expressly acknowledges that the plain error standard was applied in that case. *See Strayhorn*, 250 F.3d at 467. Yet, rather than simply following *Page*, with its highly similar facts, *Strayhorn* reaches out to *Lloyd* as authority for applying *de novo* review.

Arguably, *Strayhorn* endeavors to distinguish *Page* and its application of plain error review by suggesting that the two cases involved different sorts of objections in the court below. In *Strayhorn*, the defendant "repeatedly object[ed] to the drug quantity determination at his plea hearing and at his sentencing hearing, as well as in a written objection to the calculation of his base offense level in his presentence report," and he "made it well known that he disputed the

---

[22]Though *Strayhorn* looks to *Flowal* and *Ramirez* for guidance in construing *Apprendi*, it cannot rely upon these decisions as authority for *de novo* review of *Apprendi* claims, for the simple reason that *Flowal* and *Ramirez* are completely silent as to the standard of review for such claims.

## b. Tax Evidence

Humphrey also contends that the Government improperly used his income tax returns and the testimony of IRS Agent Gary Rasoletti to outline Humphrey's spending habits over the eighteen months that he was under investigation. Because it was undisputed that Humphrey had legitimate sources of income from rental property and tee-shirt sales, Humphrey argues that the Government's introduction of tax records and Rasoletti's testimony prejudiced the jury against him and was in clear disregard of our decision in *Carter*, which generally prohibits the use of tax records and spending habits in narcotics cases. The *Carter* rule is subject to certain exceptions, among them evidence of extravagant spending habits by the defendant or evidence that he possesses large amounts of unreported wealth. Nevertheless, Humphrey argues that the jury's refusal to order the forfeiture of the vast majority of his real property and possessions is evidence that the jury believed them to be the proceeds of lawful activity. Humphrey further submits that although Rasoletti testified about receipts for his purchases allegedly made with drug proceeds, the Government sought only the forfeiture of one of those purchases, a television, which the jury ultimately concluded was a legitimate purchase. Thus, Humphrey maintains, the Government's use of his tax returns and Rasoletti's testimony served no purpose but to put evidence of an uncharged crime, tax evasion or fraud, before the jury, which is the exact situation prohibited by *Carter*. The Government's failure to link Humphrey's unexplained wealth to drug activity, coupled with the introduction of unindicted tax charges, was unduly prejudicial and, Humphrey concludes, warrants reversal.

Humphrey's argument is foreclosed by our decision in *United States v. Copeland*, 51 F.3d 611 (6th Cir. 1995). There, a defendant charged with violation of federal drug conspiracy laws raised a relevancy challenge to the Government's introduction of certain store receipts. *Id.* at 616. Those receipts demonstrated that the defendant had purchased $5,000 in stereo equipment over a twenty-six

month period, during which time he reported no source of income. *Id.* In finding the receipts relevant and affirming the district court's admission of the evidence, we found *Carter* distinguishable in several respects. First, Carter purchased fewer items than Copeland. Second, Carter used his given name when purchasing the items in question; Copeland did not, relying instead on various aliases. Finally, certain receipts linked Copeland to alleged instrumentalities of the conspiracy that were referred to in trial testimony.

The facts of the instant case are analogous to those of *Copeland*. Humphrey purchased in excess of $450,000 worth of goods over a two-year period when he was unemployed, far more than the $5,000 at issue in *Copeland*. Furthermore, the receipts relied upon by the Government in this case referenced fruits of the alleged conspiracy. Even were we inclined to find Humphrey's case factually similar to *Carter*, the disputed receipts are evidence of tangible possessions demonstrating "extravagant spending" for which financial information generally may be introduced. *Carter*, 969 F.2d at 201. We are further persuaded that the district court's instruction of the jury, to which Humphrey raised no objection, cured any error. *See* J.A. at 429 ("The defendant is not on trial for not reporting income or any other crimes not charged in the indictment.").

### c. Vouching

Humphrey argues that the Government improperly stated its personal belief in Eaton's credibility. Specifically, Humphrey points to the Government's closing argument when it observed:

> Now, just real quickly. You know, and I don't have time, you can consider the government believes that after all that corroboration, the testimony of Henry Eaton, that is credible relative to his relationship with Darryl Morrow, at least that which is on tape.

J.A. at 324.

questioned the District Judge's authority to determine drug quantities for purposes of sentencing, and made only a single reference to a "higher standard," (J.A. at 468), as part of his argument that the informant testimony offered by the Government was inherently unreliable. It seems to me unnecessary to decide whether the portions of the record cited by the majority contain something that could possibly be construed as an *Apprendi*-like argument, when the passages I quoted earlier — and which the majority does not — feature *express* statements of Defendant's positions: namely, that it was the duty of the District Court to determine the drug quantities for which he was to be held responsible, and that it was the Government's burden to establish these quantities by a preponderance of the evidence.[21]

Alternatively, the majority cites *Strayhorn*, 250 F.3d at 467, for the proposition that an objection as to drug quantity at sentencing — which objection Defendant plainly *did* raise here — suffices to preserve *de novo* review of an *Apprendi* claim on appeal. *Strayhorn*, in turn, rests its *de novo* review on the authority of *United States v. Lloyd*, 10 F.3d 1197, 1220

---

[21] To the majority's suggestion that it would be unfair to penalize a defendant for failing to anticipate a change in the law through a not-yet-issued Supreme Court ruling, I can only say that the requirement of contemporaneous objection, *see* Fed. R. Crim. P. 30, and the limited exception in cases of plain error, *see* Fed. R. Crim. P. 52(b), reflect "a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *United States v. Frady*, 456 U.S. 152, 163, 102 S. Ct. 1584, 1592 (1982) (footnote omitted). Thus, the availability of plain error review is intended to mitigate the very unfairness of which the majority complains. In any event, the Supreme Court's application of the plain error standard in *Johnson*, under legally indistinguishable facts and circumstances — and, of course, *Page*'s application of the same standard, under even more similar circumstances to those confronting us here — dictates our course of action in this case, no matter how much we might prefer a different calibration of the competing policy concerns.

Nevertheless, even accepting the majority's view, following *Flowal* and its progeny, that *Apprendi* implicates sentencing ranges and not merely statutory maximums, this finding of an *Apprendi* error would satisfy, at most, only the first two prongs of the four-part plain error test. In that event, we still could not conclude that this purported error affects Defendant's substantial rights. Rather, it is well established, in this Circuit and others, that substantial rights are not affected, and the plain error standard is not satisfied, by a sentence that could have been achieved solely through the jury's verdict (or a defendant's guilty plea), and absent the additional findings of the sentencing court under the too-lenient preponderance standard. *See United States v. Stafford*, 258 F.3d 465, 477-79 (6th Cir. 2001); *Martinez*, 253 F.3d at 255-56 & n.5; *Page*, 232 F.3d at 544-45; *see also United States v. Pease*, 240 F.3d 938, 943-44 (11th Cir. 2001); *United States v. Sturgis*, 238 F.3d 956, 960-61 (8th Cir. 2001); *United States v. White*, 238 F.3d 537, 541-43 (4th Cir. 2001).[20] Again, this is the case here, where Defendant's 20-year sentence lies within the permitted statutory range for the indeterminate-amount drug conspiracy offense established by the jury's verdict.

The majority is able to conclude otherwise only by altogether avoiding a "substantial rights" inquiry, and instead reviewing Defendant's *Apprendi* claim *de novo*. As the basis for this, the majority first endeavors to show that Defendant raised something akin to an *Apprendi* challenge before the District Court. In all of the many passages of the record quoted by the majority, however, Defendant never once

---

[20]The concurrence in *Stafford* is instructive on this point. Judge Clay endorsed the broader, "sentencing range" reading of *Apprendi*, *see Stafford*, 258 F.3d at 479-80 (Clay, J., concurring) — not surprisingly, since he was a member of the panel in *Strayhorn*. Nevertheless, Judge Clay recognized that the plain error standard governed the defendant's *Apprendi* challenge. He then concurred in the majority's ruling that this claim did not survive plain error review, agreeing that the defendant's substantial rights were not affected by a sentence which was less than the statutory maximum under § 841(b)(1)(C) for cocaine amounts under 500 grams. *Stafford*, 258 F.3d at 482-83 & n.8 (Clay, J., concurring).

Although Humphrey concedes that the Government's statement was directed more at the credibility of Eaton's testimony with respect to Darryl Morrow, he nevertheless contends that because Eaton's credibility as to both Morrow and himself was at issue, any vouching by the Government as to one part of Eaton's testimony necessarily applied to all of his testimony.

Humphrey also argues that the Government improperly stated its personal belief in his guilt:

> I think during the course of Mr. Dudley's final argument it became pretty apparent I started getting agitated.
> Well, let me tell you my perspective on this case, based on the evidence.
> . . . .
>
> Now folks, I think the evidence is overwhelming that Montel Humphrey is guilty of the crimes that he is charged with. He has not provided you with any explanation.

J.A. at 407, 418-19.

It is well established that a prosecutor may not argue his personal belief in a witness's credibility or in a defendant's guilt, *see United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986), as juries "will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions are apt to carry more weight against a defendant than such statements by witnesses," *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991). To constitute error, however, the prosecutor's alleged misconduct must be flagrant. *See United States v. Carroll*, 26 F.3d 1380, 1385 n.6 (6th Cir. 1994). A prosecutorial comment is deemed flagrant if it tends to mislead the jury or prejudice the defendant; if it is one of a series of inappropriate comments; if it was deliberately placed before the jury; and if the other evidence of guilt is weak. *See*

*United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999).

Humphrey failed to object below to these allegedly improper comments, and therefore, we review this claim for plain error. With respect to the first comment, concerning the prosecutor's statement that Eaton's testimony was credible, Humphrey cannot demonstrate that the comment was one of a series of inappropriate comments. To the contrary, the comment appears to have been the only such comment made by the Government. Neither does the comment appear to have been a deliberate effort to mislead or prejudice the jury. Finally, the comment was made in the context of a discussion of other corroborating evidence of guilt; were we to set aside Eaton's testimony, other inculpatory evidence would remain. Thus, Humphrey can demonstrate no error.

Likewise, on the question of whether the Government improperly commented on its view of Humphrey's guilt, one we review for plain error, Humphrey has again failed to establish that the comment was flagrant. While the Government arguably skirted the limits of permissible argument by effectively suggesting that it believed Humphrey was guilty -- we are unpersuaded by the Government's argument that it was merely commenting on the quality and the quantity of the evidence -- the district court's instruction to the jury that counsels' arguments were not evidence served to counterbalance any potential jury confusion. That the comment was made in isolation, moreover, confirms this point. Accordingly, Humphrey's argument must fail.

### d. Arguing Facts Not in Evidence

Humphrey asserts that the Government committed further misconduct by arguing to the jury facts not in evidence:

Now, if you take that same eighth of a kilogram and you want to look at it in terms of shelf life for personal use, again, you use point 2 or point 3 grams of cocaine a day, so that means a gram will last you approximately three

And I would say given it affects his liberty, perhaps his life, that the Government hasn't met that burden with respect to these witness' testimony.

(*Id.* at 467 (emphasis added).) I do not see how the record could be more clear in demonstrating Defendant's acknowledgment of the role of the District Court to determine drug quantities under a preponderance-of-the-evidence standard.[18] This is hardly surprising, of course, where *Apprendi* had not yet been decided, and where, at the time of trial, the settled law dictated precisely the practice followed in this case.

Consequently, under *Page* and *Johnson*, Defendant's *Apprendi*-based challenge, raised for the first time on appeal, should be reviewed only for plain error. Under this standard, Defendant is entitled to relief only if we identify (1) an error, (2) that is plain, (3) that affects substantive rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Johnson*, 520 U.S. at 466-67, 117 S. Ct. at 1549. For the reasons discussed earlier, I believe that Defendant cannot satisfy even the first element of this test, because the District Court's findings as to drug quantity did not result in the imposition of punishment beyond the statutory maximum for the offense established by the jury's verdict — namely, a drug conspiracy involving an indeterminate amount of cocaine, with a 20-year statutory maximum sentence under § 841(b)(1)(C).[19] In my view, then, there was no violation of *Apprendi* at all in this case.

---

[18] The Government's counsel plainly shared this view, observing at sentencing, following the above-quoted statement by defense counsel, that "Mr. Dudley has accurately related to the Court what our burden is, and that's the lesser burden, preponderance." (*Id.* at 468.)

[19] As noted earlier, this 20-year statutory maximum is raised to 30 years where, as here, the defendant has a prior conviction for a felony drug offense. *See* 21 U.S.C. § 841(b)(1)(C).

But, Defendant and his counsel just as surely *did not* contest the District Court's *authority* to make the determination of drug quantities, *did not* argue that this determination should be made beyond a reasonable doubt rather than by a preponderance of the evidence, and *did not* object at trial that this was an issue for the jury and not the judge to decide. To the contrary, in his written objections to the presentence report, Defendant expressly stated: (i) his request that "**the Court . . . make the . . . finding[] at sentencing** . . . that Defendant be sentenced to a mandatory minimum term of five years imprisonment for his sale of between 500 grams and five kilograms of powder cocaine," (*id.* at 678 (emphasis added));[17] and (ii) that "it is the government's burden to prove **by a preponderance of the evidence** the quantity of narcotics for which a defendant should be held responsible," (*id.* at 683 (emphasis added)). Likewise, at sentencing, defense counsel "ask[ed] the Court" to find that Defendant's "total relevant conduct is less than five kilos," resulting in a "ten-year mandatory sentence," (*id.* at 466), and then stated, with regard to the informant testimony indicating greater drug quantities:

> [T]his Court, as the Court knows, has its own independent discretion to decide, once again, lower. **We agree with that preponderance of the evidence,** but it's still — preponderance of evidence means the Government's got to show more likely than not. It's not a close call, but show more likely than not these quantities are credible quantities to hold Mr. Humphrey accountable for.

---

[17]Given this admission in his written objections, and in light of his prior felony drug conviction (which he argued, unsuccessfully, should not be used in computing his sentence), Defendant clearly was subject to a sentence of 10 years to life imprisonment under § 841(b)(1)(B). Defendant acknowledged this in his written objections to the presentence report, and again at sentencing. (*See id.* at 466, 692.)

days, and you multiply three days times 125 and you have 375 days.

J.A. at 324.

Specifically, he argues that there was no testimony presented at trial either that an eighth of a kilogram of cocaine constitutes a personal supply lasting for 375 days or that consumption of .2 or .3 grams of cocaine constitutes personal use.

Humphrey's argument, which we review for plain error, is without merit. First, the facts relied upon by the Government were adduced by Morrow's counsel in his cross-examination of Eaton. *See* J.A. at 184 (Eaton's testimony was that the smallest amounts he ever sold were "two or three tenths of a gram" and that people buy tenths of a gram of drugs for their own personal use). Second, the Government's argument was a direct response to Morrow's suggestion that the drug quantities distributed by Eaton to him were for personal use. Finally, as Humphrey himself concedes, the Government's argument was directed at Morrow only.

### e. "Buyer-Seller" Relationship

During its closing argument, the Government suggested that an extension of credit by a drug seller to a drug buyer for the purchase of drugs was, without more, sufficient to eliminate a buyer-seller relationship. The jury, in the absence of such a suggestion, would have been permitted to consider that the cocaine attributable to Humphrey was for his personal consumption, and not for the purpose of sale or distribution in a drug conspiracy. In making this point, the prosecutor relied upon an analogy, arguing that if he had a department store credit card, then at such time as he used that credit card, he and the department store would have proceeded beyond a buyer-seller relationship and entered into a conspiracy.

Humphrey submits that the Government's analogy misstated the law, *see* Uniform Commercial Code § 1-201(9) ("'Buying' may be cash . . . or on secured or unsecured

credit.”), and reduced the jury's responsibility to one strictly of determining whether Humphrey engaged in a drug transaction for which a purchase was made on credit. In support of this argument, he relies on *United States v. Ward*, in which we declared that "fronting cocaine, without additional elements of control, is nothing more than a variation on the traditional buyer-seller relationship." 37 F.3d 243, 248 (6th Cir. 1994). He notes that because the Government failed to demonstrate that Humphrey exercised any level of control over the alleged conspiracy, had any interest in the drug operation, or displayed any concern for what happened to the drugs after their sale and distribution, its proof merely set forth a buyer-seller relationship and not a drug conspiracy.

In rejecting Humphrey's arguments, we note first that his reliance on the Uniform Commercial Code is misplaced, as it has no application in this criminal narcotics case. Humphrey's argument that purchasing on credit constitutes buying within the meaning of a buyer-seller relationship is likewise without merit. *Cf. United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996) ("We find that the trust involved in this kind of delayed payment [or credit] arrangement suggests more than a buyer-seller relationship between [the parties].”). Finally, we note that *Ward*, on which Humphrey relies, is factually dissimilar from the instant case, as no continuing criminal enterprise is at issue here.

### f. Irrelevant Evidence

The Government argued at trial that when law enforcement officials searched Humphrey's home, they discovered a wiretap affidavit unrelated to the conduct charged in this case. Thereafter, it suggested that Humphrey's possession of this affidavit was evidence that he was a drug dealer. When Humphrey's counsel began to discuss the affidavit during his closing argument, the Government objected and requested a sidebar, after which the district court instructed the jury: "You are instructed any affidavit that was mentioned by counsel has nothing to do with this case. The affidavit which has been

the instructions to the jury, since it dictates, in cases involving drug offenses, that drug type and quantity determinations that result in a sentence beyond the default statutory maximum must be made by a jury under the "beyond a reasonable doubt" standard. *Johnson*, likewise, involved an issue that was decided by the trial judge but should have been submitted to a jury. Finally, in *Johnson*, as in *Page* and here, no objection was raised at trial to the District Judge making the determination in question, presumably because this practice was in accordance with the settled law at the time. *Cf. King*, 272 F.3d at 374 n.3 (noting that this Circuit has reviewed *Apprendi*-based challenges for plain error "even when *Apprendi* had not been decided at the time a defendant was tried and sentenced").

In the present case, during the proceedings in the court below, Defendant undeniably raised *factual* challenges to the drug quantity recommendations set forth in the presentence investigation report, and then reasserted these challenges at the sentencing hearing. These challenges rested on the contention that the Government's proofs as to drug quantities relied heavily on the uncorroborated testimony of two cooperating witnesses whose credibility was open to question. (*See* J.A. at 463-68, 683-92.) For example, in his written objections to the presentence report, Defendant characterized these witnesses as "highly motivated informants," with one being "an admitted drug addict" and the other "an admitted liar with a personal vendetta against" Defendant. (*Id.* at 684.) In light of the significant sentencing consequences if the testimony of these witnesses were credited, Defendant and his counsel urged the District Court to "exercise some caution" in assessing this testimony. (*Id.* at 465.)[16]

---

[16] In addition, because the sentencing judge had not presided at trial, defense counsel went to some lengths at sentencing to point out that the jury's guilty verdicts did not necessarily mean that the jury found the two cooperating witnesses fully credible, particularly as to specific drug transactions and quantities. (*See id.* at 465-66.)

Moreover, many of our own subsequent decisions have adhered to *Page*'s plain error standard in addressing *Apprendi* challenges. *See*, *e.g.*, *United States v. King*, 272 F.3d 366, 374 (6th Cir. 2001); *United States v. Martinez*, 253 F.3d 251, 255 (6th Cir. 2001); *United States v. Neuhausser*, 241 F.3d 460, 464 (6th Cir. 2001).

In electing to apply plain error review, *Page* cites the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461, 117 S. Ct. 1544 (1997). *Johnson* is instructive because it, like *Page* and the present case, involved a claim that a District Court had failed to submit an element of a criminal offense for the jury's determination beyond a reasonable doubt. Instead, the jury in *Johnson* was instructed, in accordance with then-existing Eleventh Circuit precedent, that the element in question, materiality, would be decided by the District Judge. After the defendant was convicted, but before her appeal was heard, the Supreme Court held that materiality was a question for the jury, and not the Court, and the defendant then raised this issue in her pending appeal.

The Court of Appeals reviewed this matter for plain error, and the Supreme Court, upon granting certiorari, likewise concluded that the plain error standard governed its inquiry, because the defendant "did not object to the trial court's treatment of materiality." *Johnson*, 520 U.S. at 465-66, 117 S. Ct. at 1548. To be sure, this lack of objection was to be expected: "at the time of trial it was settled that the issue of materiality was to be decided by the court, not the jury," but "by the time of appellate consideration, the law had changed, and it is now settled that materiality is an issue for the jury." 520 U.S. at 468, 117 S. Ct. at 1549. Nevertheless, this lack of objection, however understandable, triggered plain error review.

Consequently, even if *Page* had not settled the issue, *Johnson* would dictate that we apply plain error review to an *Apprendi*-based claim raised for the first time on appeal. As the majority recognizes, and as we have observed elsewhere, *see*, *e.g.*, *King*, 272 F.3d at 374 & n.3, *Apprendi* implicates

mentioned has absolutely nothing to do with the investigation here or this case. Please disregard it." J.A. at 368. This instruction notwithstanding, the Government's rebuttal closing argument again made reference to the affidavit and suggested that it was evidence that Humphrey was engaged in illegal narcotics activity. In making such an argument, Humphrey maintains that the Government successfully placed before the jury only its interpretation of evidence that the district court had already determined was irrelevant.

Because Humphrey failed to raise an objection at trial, we review this claim for plain error. The Government responds, and we agree, that the wiretap affidavit -- like the gun, money, telephone scrambler, and wiretap detector seized from Humphrey's residence -- was circumstantial evidence of the defendant's knowledge regarding the manner and means in which law enforcement engages in drug trafficking investigations and his knowing participation in a conspiracy to distribute cocaine. While the wiretap affidavit standing alone would likely not be relevant evidence, particularly since it refers in no way to Humphrey, we believe that it, coupled with the other "tools of the trade," is probative of Humphrey's knowledge of drug trafficking investigations.

With respect to Humphrey's argument that the Government violated a court order not to discuss the affidavit, his argument is not well taken. First, the district court merely instructed the jury that the affidavit had nothing to do with Humphrey or the charged conduct in the case. Our review of the record suggests that it did not prohibit counsel from referring to it. The Government made reference in its closing argument to the affidavit, but only to demonstrate Humphrey's knowledge of criminal investigations. By contrast, when Humphrey's counsel mentioned the affidavit, he suggested that the affidavit was evidence that Humphrey was being investigated: "Well, [Humphrey's] got an affidavit in his house, and what do you think the affidavit probably says there? That, rightly or wrongly, he's being investigated." J.A. at 368. The Government promptly objected to this

misstatement of the evidence, and the district court sustained the objection. There was no error.

### g. Improper Closing Argument

In its rebuttal closing argument, the Government argued that even Humphrey's counsel, David Dudley, knew that Humphrey's conversations with his accountant amounted to a confession: "David Dudley knows that conversation [between Humphrey and his accountant] is as close to a confession as anything in this whole courtroom, and he has to deal with it because he knows you are going to see that." J.A. at 408-09. Humphrey suggests that this argument improperly relied upon Humphrey's counsel to vouch for the Government's view of Humphrey's guilt.

The Government responds that "that conversation" referred to an intercepted telephone conversation between Humphrey and his accountant in which Humphrey allegedly expressed some concern over paperwork related to his purchase of a business, because the business owner had had prior dealings with the Drug Enforcement Administration ("DEA"). Further, the Government maintains that its reference to the conversation as a "confession" was merely an attempt to discredit Dudley's "spin on the conversation" by suggesting that a legitimate business owner with legitimate sources of income would have no concern about any DEA involvement in one of his business ventures.

On this record, we do not find that the prosecutor's comments can be reasonably construed as implying that defense counsel believed his client was guilty. We find no error in the closing argument.

### h. Cumulative Impact

When the aforementioned errors alleged by Humphrey are viewed in the context of the entire trial, Humphrey argues that their cumulative impact mandates reversal, even if any one error in isolation does not. These errors, Humphrey maintains, were particularly prejudicial given that his trial

for claims of *Apprendi* violations,[14] *Page* squarely addresses — and, in my view, definitively resolves — this issue. Specifically, we held:

> Defendants . . . failed to object to the district judge making the determination of drug quantities. Where there has been no objection, review is for plain error.

*Page*, 232 F.3d at 543 (citing Fed. R. Crim. P. 52(b)).[15]

Once again, *Page*'s ruling on this point is in accord with the decisions of *all* of our sister Circuits. *See United States v. Titchell*, 261 F.3d 348, 352 (3d Cir. 2001); *United States v. Fields*, 251 F.3d 1041, 1044-45 (D.C. Cir. 2001); *United States v. White*, 240 F.3d 127, 133 (2d Cir. 2001); *United States v. Sturgis*, 238 F.3d 956, 960 (8th Cir. 2001); *United States v. White*, 238 F.3d 537, 541 (4th Cir. 2001); *United States v. Nance*, 236 F.3d 820, 824 (7th Cir. 2000); *United States v. Keeling*, 235 F.3d 533, 538 (10th Cir. 2000); *United States v. Gerrow*, 232 F.3d 831, 833 (11th Cir. 2000); *United States v. Mojica-Baez*, 229 F.3d 292, 306-07 (1st Cir. 2000); *United States v. Nordby*, 225 F.3d 1053, 1059-60 (9th Cir. 2000); *United States v. Meshack*, 225 F.3d 556, 575 (5th Cir. 2000), *amended on reh'g*, 244 F.3d 367 (5th Cir. 2001).

---

[14]As it happens, the standard of review was not determinative in *Corrado* and *Rebmann*. In the former case, the Court found no *Apprendi* violation, and the defendant could not have prevailed even under *de novo* review. In the latter, the defendant's sentence exceeded the statutory maximum for the offense to which she had pled guilty, and her claim therefore could have satisfied the more stringent plain error standard.

[15]On appeal, at least one of the four defendants in *Page* questioned the District Court's method of computing drug quantities. We rejected this challenge, and stated that "[o]ther issues . . . regarding drug quantity are addressed in the unpublished appendix to this opinion." *Page*, 232 F.3d at 541-42 & n.2. As observed by the majority, however, *Page* does not indicate what sorts of challenges, if any, were or were not raised before the District Court — that is, apart from our direct statement that the defendants did *not* raise an *Apprendi* issue in the court below, thereby triggering plain error review.

presents the issue of the proper interpretation of *Apprendi*.[13] As discussed below, this is not such a case — or, more accurately, it would not be, if Defendant's *Apprendi* claim were evaluated under the proper standard of review. The majority's decision to apply *de novo* review, however, lends new (and undue) significance to its expansive reading of *Apprendi*, and compounds error with further error.

## II.

By now, my views regarding the correct construction of *Apprendi* should be evident. As conceded at the outset, however, the Court's opinion in that case contains language that arguably supports a few competing interpretations. In any event, whether one subscribes to the "maximum penalty" or "sentencing range" view of *Apprendi*, the outcome of the present case should be no different, because Defendant/Appellant Humphrey cannot possibly satisfy the governing "plain error" standard. Yet, the majority concludes otherwise, upon first determining that Defendant's *Apprendi*-based challenge should be reviewed *de novo*. According to the majority, Defendant sufficiently raised an *Apprendi* issue at sentencing to preserve the issue on appeal or, alternatively, his factual challenges to drug quantities at sentencing sufficed to preserve the issue. I take a different view, both as to the record and as to the governing law. I again must acknowledge, however, that our Circuit has provided mixed messages — and, all too often, no guidance at all — in determining the standard under which *Apprendi* challenges should be reviewed.

Although our initial post-*Apprendi* decisions in *Corrado* and *Rebmann* did not consider the proper standard of review

---

[13]Or perhaps, as the majority suggests, the Supreme Court will resolve the matter for us, as it appears that the Court will revisit *Apprendi* in a forthcoming opinion.

was built on weak, circumstantial evidence of guilt in which he was convicted only of conspiracy (and not of any of the underlying substantive counts) based on the testimony of alleged co-conspirators. We disagree. Examining the record as a whole, we fail to find any error in the foregoing that, singularly or cumulatively, mandates reversal.

### B. District Court Misconduct

#### 1. Standard of Review

We review de novo whether a district court's alleged failure to conduct a hearing to inquire into a conflict of interest between a defendant and his trial counsel violated a defendant's Sixth Amendment right to effective counsel. *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000). We review for clear error a district court's factual findings concerning whether a party has improperly used its peremptory challenges on the basis of race. *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996).

#### 2. Analysis

Humphrey argues that the district court erred in two respects. First, it failed to conduct an inquiry into the actual conflict of interest between Humphrey and his counsel. Second, the district court improperly reviewed his *Batson* challenge. Neither argument has merit.

#### a. Conflict of Interest

On February 22, 1999, eight months after Humphrey's trial, David Dudley discovered a conflict of interest between himself and Humphrey, prompting Dudley to file with the district court a motion to withdraw as counsel. *See* J.A. at 757-58 (discussing the "apparent" conflict created by Humphrey's pro se motions alleging, *inter alia*, that Dudley was incompetent and not "registered" to practice law in the Northern District of Ohio, and that Dudley was actively conspiring to "defraud and entrap" Humphrey); J.A. at 758 (discussing the "actual" conflict created by Humphrey's filing

of complaints with the State Bar of Georgia alleging that Dudley was not licensed to practice law in a number of federal criminal matters involving previously represented defendants). In Dudley's estimation, the discovery of this conflict made it impossible for him to argue on Defendant's behalf in furtherance of new trial and sentencing issues.

Judge Gaughan reviewed the transcript of a prior hearing on this issue conducted by Judge Bell on September 3, 1998. Finding that the issue was fully discussed and resolved by Judge Bell, the district court denied Dudley's motion, concluding that it would be patently unfair to leave the defendant unrepresented at the sentencing, particularly in light of the fact that post-trial motions had been fully briefed and presentence investigation report ("PSR") objections already filed. It did note, however, that Humphrey remained free to fire Dudley and secure another attorney or proceed to sentencing pro se. Humphrey did neither. He now assigns error to the district court's denial of additional time for him to retain new counsel and its failure to inquire into the facts of the alleged conflict, notwithstanding the Government's motion seeking to conduct just such an inquiry.

A defendant is denied his Sixth Amendment right to effective counsel when his attorney operates under a conflict of interest. *Glasser v. United States*, 315 U.S. 60, 69-70 (1942). A trial court, moreover, has a duty to inquire into the nature of a conflict at such time as it becomes aware of a potential or actual conflict of interest. *Wood v. Georgia*, 450 U.S. 261, 272-74 (1981). Failure of a trial court to conduct such an inquiry mandates a reversal if the defendant can show the conflict adversely affected his counsel's performance. *Mickens v. Taylor*, 122 S. Ct. 1237, 1245 (2002).

We reject Humphrey's argument. First, Humphrey's case is distinguishable from the *Glasser* line of cases, as those cases involved an attorney's *joint* representation of multiple defendants, a situation not present in the instant case. Second, it was only *after* trial that a conflict presented itself, and that, only as a result of Humphrey's filing of numerous

Given this state of affairs, perhaps it would behoove this Court to consider *en banc* review of a case that starkly

---

2001 WL 493372, at *2 (6th Cir. May 4, 2001); *United States v. Oldham*, 2001 WL 406424, at *3 (6th Cir. Apr. 2, 2001); *United States v. Neuhausser*, 241 F.3d 460, 466-72 (6th Cir. 2001); *United States v. Caldwell*, 238 F.3d 424, 2000 WL 1888682, at *4 (6th Cir. Dec. 19, 2000). Not one of these cases addresses (or even mentions) a statutory minimum sentence, as would be necessary if *Flowal* were now this Circuit's sole and definitive statement of the scope of *Apprendi*. Although the majority places significance on the fact that most of these cases are unpublished, it seems to me that the panel in each instance was bound to ascertain and follow the law of this Circuit, whether or not it planned to publish its decision. Indeed, there was no need for these panels to publish their rulings, as they were merely following our prior published precedents in *Corrado*, *Page*, and *Munoz*.

More importantly, as a legal matter, the majority's "development of the law" theory cannot hope to account for cases with legally indistinguishable facts but different outcomes. *Munoz* and *Ramirez*, for example, both involved drug-related findings by a District Judge that triggered an enhanced statutory sentencing *range*, both minimum and maximum, but the defendant in each case was sentenced within the default 20-year maximum of § 841(b)(1)(C). *Munoz* held that "the *Apprendi* ruling is not applicable here," 233 F.3d at 414, while *Ramirez* found a violation of *Apprendi*, 242 F.3d at 350-52. If *Ramirez* is deemed correct — or, more to the point, binding on subsequent panels — the conclusion is inescapable that *Munoz* is not. *Munoz*, then, has been overruled, plain and simple — notwithstanding our Circuit rule that one panel may not overrule another.

The question becomes, what to do about this state of affairs? The majority suggests — albeit tacitly, given its assertion that our post-*Apprendi* decisions are not in conflict — that the later decisions should prevail over the earlier ones. I am uncomfortable with this, as it seems to sanction a "one free bite" exception to our rule of *stare decisis*. In contrast, adherence to the earlier cases reinforces the principle of *stare decisis* by demonstrating our resolve not to permit one panel to overturn the ruling of another. Under the present circumstances, moreover, there is the additional consideration that *Flowal* and its progeny have effectively overruled the Supreme Court's *McMillan* decision, and not just existing Sixth Circuit precedent. This, in my view, is the ultimate "tiebreaker."

maximums or sentencing ranges generally, I would respect the prerogative of the panel in that case to reach a decision which, right or wrong, would bind all subsequent panels, including this one. As matters now stand, however, I not only harbor substantial doubt about the analysis in *Flowal*, but I fear that this decision and its progeny, rendered without sufficient regard for this Circuit's pre-existing precedents, have reduced the rule of *stare decisis* from a settling principle into an empty bromide that may be recited as "requiring" either of two diametrically opposed outcomes of an *Apprendi*-based challenge.[12]

---

[12]In criticizing *Flowal*, I mean no disrespect to the panel that decided it. I have already acknowledged that *Apprendi* itself is not a model of clarity. Moreover, regarding *Flowal*'s failure to account for this Circuit's existing post-*Apprendi* precedents, it must be noted that *Page* and *Munoz* were decided in November of 2000, with *Flowal* following soon thereafter, on December 11, 2000. This Circuit's initial flurry of post-*Apprendi* decisions admittedly posed a challenge to panels seeking to ensure that their decisions were consistent with our existing law on the subject. Nevertheless, *Flowal* and its progeny *do* depart from the decisions that preceded them. Thus, I respectfully differ from the majority's view that *Flowal*, *Ramirez*, and *Strayhorn* merely reflect the further development of our post-*Apprendi* jurisprudence, resolving issues left open in our initial decisions on the subject. I find this explanation wanting, both factually and legally.

First, if our initial "statutory maximum" reading of *Apprendi* were now a dead letter, supplanted by the broader holdings of *Flowal* and its progeny, one would expect that panels would no longer cite our earlier statement of the rule of *Apprendi*, but instead would ask whether a District Judge's findings by a preponderance of the evidence affected the sentencing *range* faced by the defendant. Yet, in the time since *Flowal* was decided, several panels of this Court have continued to follow the narrower rule of *Corrado*, *Page*, and *Munoz*, holding that *Apprendi* does not apply where the defendant's sentence lies within the statutory maximum for the offense established by the jury verdict (or guilty plea) alone. *See, e.g.*, *United States v. McLemore*, 2001 WL 1563652, at *3 (6th Cir. Dec. 3, 2001); *United States v. Argo*, 2001 WL 1216966, at *6 (6th Cir. Oct. 4, 2001); *United States v. Delgado*, 2001 WL 1176420, at *3 (6th. Cir. Sept. 25, 2001); *United States v. Arbelaez-Agudelo*, 2001 WL 1042249, at *3 n.2 (6th Cir. Aug. 27, 2001); *United States v. Cook*, 2001 WL 777404, at *9 (6th Cir. July 2, 2001); *United States v. Ridley*, 2001 WL 549401, at *3 (6th Cir. May 16, 2001); *United States v. Deaton*,

pro se pleadings alleging misconduct by Dudley. Third, at a September 3, 1998, hearing on the matter (at which Humphrey was scheduled to be sentenced), Judge Bell asked Humphrey whether he wished Dudley to continue as his counsel, and Humphrey responded, "Yes." Finally, Judge Gaughan properly reviewed the transcript of Judge Bell's hearing and concluded that no additional hearing was necessary and no additional time was required to permit Dudley to retain new counsel. The record reveals that Dudley vigorously defended Humphrey's interests, filed numerous pre-trial and post-trial motions on his behalf, and argued successfully for the lowest sentence provided by law.

### b. *Batson* Challenge

Humphrey argues that the Government improperly used its peremptory challenges during voir dire against two African-American venirepersons, juror number four (Howell) and alternate juror number thirty (Luckie), in a systematic effort to exclude African-Americans from the jury.

In evaluating such a claim, we are guided by a three-step inquiry, first articulated in *Batson v. Kentucky*, 476 U.S. 79, 93-98 (1986). The opponent of the strike (Humphrey) must first establish a prima facie case by demonstrating that the strike was made on the basis of race. A successful showing by the opponent results in a shift of the burden of production to the strike proponent (the Government) to set forth a race-neutral explanation for its challenge; in this regard, the Government's proffered reason need not be persuasive or even plausible, so long as it is neutral. *See United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999) (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). Finally, the district court must determine whether the opponent has proved purposeful racial discrimination, mindful that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768.

Humphrey assigns error to the district court's analysis under *Batson*'s third prong, contending that the district court

failed to evaluate the Government's explanation and the circumstances of the case to determine whether purposeful racial discrimination in fact had occurred. He concedes that a district court's resolution of a *Batson* challenge is entitled to great deference, *see Batson*, 476 U.S. at 98, but submits that the district court's failure to conduct *any* inquiry requires no deference.

In an unpublished decision, we suggested that a defendant who fails to insist upon and receive a definitive ruling from a trial court on a *Batson* challenge may be said to have waived any objection for purposes of appeal. *See United States v. Compton*, Nos. 93-1649, 93-1712, 1994 WL 328303, at *2 (6th Cir. July 1, 1994) (unpublished) ("The government first argues, and we believe correctly, that Compton has waived his *Batson* challenge because he failed to get a definitive ruling by the district court for this court to review."). While *Compton*, as an unpublished opinion, is not dispositive, it highlights the difficulty of assessing a ruling where, as here, there is an incomplete record underlying it to review. On the record before us, we conclude that Humphrey's claim as to Luckie is without merit. Humphrey failed to rebut the Government's race-neutral explanation for its dismissal of Luckie – that the juror's hypertension would have been exacerbated had he been empaneled on the jury -- and the district court's conclusion overruling Humphrey's objection cannot therefore be said to have been clearly erroneous. With respect to Howell, we have little to review precisely because Humphrey limited his objection to Luckie. Because Humphrey's counsel raised a *Batson* challenge long after the juror had already been excused without objection, the district court concluded that even if it sustained his *Batson* challenge, Humphrey would be unable to seat her on the jury because she had already exited the courtroom. The Government now provides an after-the-fact explanation for its dismissal of Howell -- her history as an unsuccessful plaintiff in a federal racial discrimination suit suggested a possible bias against the judicial system -- which, if presented at trial, likely would have proved an adequate race-neutral explanation. Because, however, it is an after-the-fact explanation, we are reluctant

principle, the panel vacated the defendant's sentence and remanded for resentencing.

Read properly, and as applied in *Ramirez* and *Strayhorn*, *Flowal* plainly *cannot* be said to be in accord with the view of *Apprendi* adopted by our sister Circuits. To the contrary, and as noted at the outset, *Flowal* places us in "a minority of one." *Hill*, *supra*, 252 F.3d at 921. If I were convinced that *Flowal* had correctly construed *Apprendi*, I would have fewer qualms about our solitary position on this point. More importantly, if *Flowal* were this Circuit's first word on *Apprendi*, or if it at least could be said that *Flowal* presented the first occasion for us to decide whether *Apprendi* implicates only statutory

---

amendments make the jury the right decisionmaker (unless the defendant elects a bench trial), and the reasonable-doubt standard the proper burden, when a fact raises the maximum lawful punishment. How statutes are drafted, or implemented, to fulfil that requirement is a subject to which the Constitution does not speak.

*United States v. Brough*, 243 F.3d 1078, 1079 (7th Cir. 2001) (citation omitted).

Thus, in the wake of *Apprendi*, there is no constitutional significance in the question whether a 20-year statutory maximum sentence under § 841(b)(1)(C) is "really" a sentence within the 10-years-to-life range governing the different "offense" set forth in § 841(b)(1)(A). Instead, the offense is defined solely by reference to the jury's verdict, and the sentencing court then is free to determine, by a preponderance of the evidence, one or more factors that impact upon the sentence for this offense, so long as these factors do not take the sentence beyond the statutory maximum for the offense. This is the process used by federal judges for some time now to determine sentences under the Sentencing Guidelines, and it seems untenable to suggest that Congress has less authority to establish relevant sentencing considerations by statute, as in § 841(b), than the Sentencing Commission may accomplish through the Guidelines. Moreover, I cannot conceive that *Apprendi*'s functional approach was meant to invite more mind-reading of sentencing judges to determine which of a set of overlapping statutory provisions defined the real "offense" for which a defendant was sentenced. Rather, a District Court "creates a separate offense," in the parlance of *McMillan*, only by sentencing a defendant in excess of the statutory maximum for the offense established through the jury's verdict.

range," even though the resulting sentence might still lie within the lower statutory bounds for the offense as determined by the jury's verdict. *See Strayhorn*, 250 F.3d at 469-70.[11] Applying this much broader

---

[11]*Strayhorn* at least attempts to account for the Supreme Court's decision in *McMillan*, citing that case for the proposition that "the government may still rely upon a district court's finding of relevant conduct by a preponderance of the evidence, but only insofar as it 'operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it' and does not 'alter[] the maximum penalty for the crime committed nor create[] a separate offense calling for a separate penalty.'" *Strayhorn*, 250 F.3d at 470 (quoting *McMillan*, 477 U.S. at 87-88, 106 S. Ct. at 2417). The quoted passage from *McMillan*, however, merely describes the Pennsylvania law at issue in that case, and does not purport to set forth the essential requirements for any mandatory minimum sentencing scheme to pass constitutional muster.

Moreover, if it once was possible to define *McMillan*'s holding by reference to such notions as "separate offenses" or "separate penalties," the decision and analysis in *Apprendi* now preclude such an effort. As we recognized in *Rebmann*, *Apprendi* marks a "radical departure" in the Supreme Court's method of determining the "elements" of an offense. *Rebmann*, 226 F.3d at 524. Questions of statutory structure and legislative intent have given way to purely functional considerations, and "the relevant inquiry is one not of form, but of effect — does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494, 120 S. Ct. at 2365; *see also Rebmann*, 226 F.3d at 524. As the Seventh Circuit recently explained, in rejecting the contention that 21 U.S.C. § 841 is unconstitutional:

> If Congress had specified that only judges may make the findings required by § 841(b), or that these findings must be made by a preponderance of the evidence, then § 841 would create a constitutional problem. But the statute does not say who makes the findings or which party bears what burden of persuasion. Instead the law attaches effects to facts, leaving it to the judiciary to sort out who determines the facts, under what burden. It makes no constitutional difference whether a single subsection covers both elements and penalties, whether these are divided across multiple subsections (as § 841 does), or even whether they are scattered across multiple statutes. *Apprendi* holds that the due process clause of the fifth and fourteenth

to credit it, and we therefore decline to reach this issue as it relates to Howell.

### C. Jury Instructions

### 1. Standard of Review

When reviewing a jury instruction to which a defendant failed to object at trial, we review for plain error, which requires us to determine "whether the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992).

### 2. Analysis

Humphrey argues that the district court's instruction of the jury was flawed in three respects. First, the district court failed to inform the jury that it was required to reach unanimity on every element of the charged offenses. Second, the district court failed to instruct the jury to determine whether there was one conspiracy or multiple conspiracies. Third, the district court failed to instruct the jury to determine the type of drugs that Humphrey conspired to possess or distribute.

We reject Humphrey's arguments.

### a. Unanimity

At the close of the evidence, the district court provided the following instruction to the jury concerning the requisite legal elements of a criminal conspiracy:

> With regard to the first element, the criminal agreement, the government must prove that two or more persons conspired, or agreed, to cooperate with each other to commit the crime of distribution of narcotics or possession with intent to distribute narcotics or to commit the crime of money laundering.
>
> . . . .

What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people, to cooperate with each other to commit the crime of distribution of narcotics or possession with intent to distribute narcotics as to Counts 1 and 2, or to engage in money laundering as to Count 17.

J.A. at 436-37.

Because the district court failed to instruct the jury that it was required to decide unanimously that the Government proved *each* element beyond a reasonable doubt, Humphrey argues that his conviction cannot stand. Specifically, he submits that the district court should have instructed the jury that it was to identify the "two or more people" as a precondition to conviction, particularly given that Count One of the indictment identified seven people by name and "others known and unknown to the Grand Jury," Count Two identified six people by name and "others known and unknown to the Grand Jury," and Count Seventeen identified four people by name and "others known and unknown to the Grand Jury." He reasons that since a conspiracy necessarily involves at least two people, then the specific identity of a defendant's co-conspirator must be an element of the offense.

Humphrey's argument is not well taken. First, the district court provided a thorough instruction on what constitutes a conspiracy, listing and defining each of the elements that the Government was required to prove beyond a reasonable doubt. Second, the specific unanimity instruction sought by Humphrey is generally required only in one of three circumstances: when the nature of the evidence is particularly complex; when there is a variance between the indictment and the proof adduced at trial; or when there is some tangible evidence of jury confusion, as when the jury has asked questions of the court. *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997). None of these scenarios exists in this case. Finally, Humphrey's reliance on *Richardson* is misplaced, as at issue in that case was a jury instruction

242 F.3d at 351-52.[10] Judge Siler concurred, finding that the panel was bound by the decision in *Flowal*, but questioning whether *Apprendi* "is as far-reaching as we determine in this case, following *Flowal*," and opining that *McMillan* should govern challenges to mandatory minimum sentences. *Ramirez*, 242 F.3d at 352 (Siler, J., concurring).

Most recently, in *Strayhorn*, the panel addressed a 10-year mandatory *minimum* sentence under § 841(b)(1)(B), for a marijuana distribution conspiracy involving 100 kilograms or more of marijuana, that precisely matched the 10-year statutory *maximum* sentence under § 841(b)(1)(D), for a prior drug felon convicted of an offense involving an indeterminate amount of marijuana. Again, the panel chose to follow *Flowal* and *Ramirez*, and did not discuss *Page* or *Munoz*. Interestingly, *Strayhorn* states that "[i]n *Flowal*, we explained that each penalty provision of § 841(b) constitutes a different crime with different elements, including drug weight, which must be proved beyond a reasonable doubt ***when sentencing a defendant in excess of the default statutory maximum set out in § 841(b)(1)(C) for all drugs except marijuana, or in § 841(b)(1)(D) for marijuana,***" and that "[o]ur sister circuits have uniformly agreed with" this rule. *Strayhorn*, 250 F.3d at 468 (emphasis added).

Of course, if this were the rule announced in *Flowal*, our sister circuits *would be* in agreement, and the sentence at issue in *Strayhorn* would have been upheld as not in excess of the default statutory maximum found at § 841(b)(1)(D). The *Strayhorn* panel quickly confirmed, however, that *Flowal* and *Ramirez* go a good deal farther, encompassing any case in which a sentencing court finds "aggravating factors" by a preponderance of the evidence that trigger a "higher penalty

---

[10]Notably, the rule stated in *Ramirez* is remarkably similar to the standard advocated by Justice Thomas in his concurrence in *Apprendi*: namely, that "a 'crime' includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)." 530 U.S. at 501, 120 S. Ct. at 2368 (Thomas, J., concurring).

reasoning, his opinion is, in the end, only a *concurrence*, and not a ruling of the Court — and even Justice Thomas recognized that his proposed rule would require that *McMillan* be overturned, while the *Apprendi* majority expressly declined to go so far. As stated by the Fourth Circuit, it is "not our role" to overturn *McMillan*, where the Supreme Court has elected not to do so. *Harris*, *supra*, 243 F.3d at 809. Finally, and most significantly, *Flowal*'s broad reading of *Apprendi* is flatly at odds with our earlier decision in *Munoz*, in which we squarely held that *Apprendi* did not apply to a sentencing judge's findings by a preponderance of the evidence that triggered an elevated sentencing range, so long as the resulting sentence did not exceed the maximum achievable absent the judge's additional determinations. The panel in *Flowal* had neither the authority nor the stated intention to overrule *Munoz*, but that was the clear import of its decision.

Despite its many flaws and questionable legitimacy, *Flowal* has taken on a life of its own in this Circuit, spawning a line of cases parallel to, but wholly inconsistent with, another distinct line of cases following the "statutory maximum" rule of *Munoz*, *Page*, and *Rebmann*. The most prominent members of the *Flowal* line, and the ones relied upon by the majority here, are the decisions in *United States v. Ramirez*, 242 F.3d 348 (6th Cir. 2001), and *United States v. Strayhorn*, 250 F.3d 462 (6th Cir. 2001). In *Ramirez*, as here, the defendant was convicted by a jury of conspiracy to distribute cocaine, and the District Court imposed a mandatory minimum sentence of 20 years' imprisonment under § 841(b)(1)(A) upon finding that (i) the defendant had a prior felony drug conviction, and (ii) the amount of cocaine involved in the offense exceeded 5 kilograms. The panel did not cite *Page* or *Munoz*, but instead found *Flowal* controlling, stating that "[a]ggravating factors, other than a prior conviction, that increase the penalty from a nonmandatory minimum sentence to a mandatory minimum sentence, or from a lesser to a greater minimum sentence, are now elements of the crime to be charged and proven." *Ramirez*,

relating to a prosecution under 21 U.S.C. § 848 (continuing criminal enterprise) and not under 21 U.S.C. § 846, as in the instant case.

### b. Number of Conspiracies

Humphrey contends that even if the identity of his alleged co-conspirator is not an element of the offense, the district court nevertheless should have instructed the jury to determine whether there were multiple conspiracies or only one. He reasons that because Eaton was named as a co-conspirator in both conspiracy counts (Counts One and Two) and the jury was not instructed to identify specifically Humphrey's alleged co-conspirator, the jury could have concluded that Humphrey conspired only with Eaton, which would have compelled it to convict Humphrey of both counts, despite the fact that Counts One and Two required proof of the same elements and relied on the same facts. Such a result, Humphrey suggests, would offend due process.

The Government maintains that Humphrey was properly indicted in a case involving multiple conspiracies and that he was not entitled to an instruction of the jury requiring it to determine the number of conspiracies. Although the indictment does not so allege, the Government argues that Count One charged a "hub" or "wheel" conspiracy with Humphrey, as drug supplier, positioned at the center, and Eaton and other middlemen as spokes of the wheel. Count Two, according to the Government, charged a chain conspiracy with narcotics flowing from Humphrey through Eaton to Morrow and others working directly with Eaton. Humphrey, in response, argues with some force that if he was involved in a hub conspiracy with Eaton, then that conspiracy necessarily included any chain conspiracy with Eaton and his buyers (e.g., Morrow), and thus there existed only one conspiracy.

We note that because Humphrey neither requested a multiple conspiracy instruction nor objected to the district court's use of a general instruction on the law of conspiracy, we review this claim for plain error. *See United States v.*

*Mack*, 837 F.2d 254, 258 (6th Cir. 1988).  The Government's suggestion that Humphrey entered into a hub conspiracy with Eaton and others for certain transactions only to end that conspiracy to form a new chain conspiracy to supply drugs from Humphrey to Eaton to Morrow seems dubious at best.  As we observed in *United States v. Gaitan-Acevedo*, "[t]he key to establishing whether distinct sub-agreements are encompassed within one single conspiracy, is to determine whether the different sub-groups are acting in furtherance of one overarching plan." 148 F.3d 577, 586 (6th Cir. 1998) (internal quotation marks omitted) (quoting *United States v. Ghazaleh*, 58 F.3d 240, 245 (6th Cir. 1995)).  Here, with the benefit of hindsight, it seems clear that there was one overarching plan: for Humphrey to distribute narcotics to Eaton who would then resell them at a profit to third parties.  While a multiple conspiracy instruction likely would have removed any doubt concerning the number of conspiracies that the jury found to be at issue, we are unconvinced that such an instruction was required.

Although the parties do not raise this issue, any error appears to lie not in the jury's instruction, but in the indictment's seemingly duplicative counts, as Count One charges the same conduct for the same time period as that charged in Count Two.  That the overt acts of Count One focus on Humphrey and the overt acts of Count Two focus on Morrow does not change the fact that both relate to the same conspiracy.  Indeed, the Government's concession that "[Count One] would have been the only drug conspiracy count as against Humphrey were it not for the fact that Humphrey was joined at trial by Daryl Morrow" strengthens our suspicion that Count Two was surplusage.  Because, however, Humphrey would have been subject to the same statutory and Guidelines penalties in either case whether he was convicted of Count One or Count Two or both, we must conclude that any error in the district court's instruction of the jury or in the Government's indictment of Humphrey was harmless.

occasion for adopting such a construction of *Apprendi*, as the sentences in both cases violated the narrower "statutory maximum" variant of *Apprendi*'s "rule."

There are a number of other flaws, as well, in the analysis through which the panel in *Flowal* sought to support its broad reading of *Apprendi*.  First, throughout its discussion of mandatory minimum sentences and the resulting diminution of a sentencing court's discretion, *Flowal* never once mentions the Supreme Court's controlling statement on mandatory minimums in *McMillan*, nor the language in *Apprendi* expressly confirming that *McMillan* continues to govern in "cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict." *Apprendi*, 530 U.S. at 487 n.13, 120 S. Ct. at 2361 n.13.  Next, *Flowal* misreads the post-*Apprendi* decisions of other Circuits, claiming that the Eighth Circuit held in *Aguayo-Delgado*, *supra*, that "it is improper for a judge to determine any facts other than a prior conviction that would increase the penalty range beyond that applicable to the crime for which the jury has convicted the defendant." *Flowal*, 234 F.3d at 937 n.3.  In fact, *Aguayo-Delgado* expressly *rejects* a proposed reading of *Apprendi* as encompassing mandatory minimum sentences, recognizing that *McMillan* provides the "governing constitutional standard" on this issue.  *Aguayo-Delgado*, 220 F.3d at 933-34.[9]

Further, it is noteworthy that *Flowal* relies on, and quotes extensively from, Justice Thomas's concurrence in *Apprendi*.  Without in any way denying the force of Justice Thomas's

---

[9]In *Aguayo-Delgado*, as in the case before us, the defendant was sentenced to a 20-year term of imprisonment.  The Eighth Circuit found that this sentence was "permissible under *Apprendi* and *McMillan*," because it fell "within the statutory range authorized by § 841(b)(1)(C) without reference to drug quantity." 220 F.3d at 934.  It is ironic that *Aguayo-Delgado*, as transformed through its misreading by the panel in *Flowal*, now is an indirect part of the chain of authority in this Circuit for a result directly *opposite* that reached by the Eighth Circuit under identical facts.

*Apprendi*, the panel concluded that it had adopted the principle set forth in the Supreme Court's prior *Jones* decision:  namely, that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Flowal*, 234 F.3d at 936 (quoting *Jones*, 526 U.S. at 248 n.6, 119 S. Ct. at 1224 n.6); *see also Flowal*, 234 F.3d at 936 (quoting *Apprendi*'s "increase[] . . . beyond the prescribed statutory maximum" variant of its ruling).  The panel then addressed *Rebmann* (albeit in a footnote), and recognized that the dispositive feature of that case was the sentencing court's factual determination, by a preponderance of the evidence, which had "significantly impact[ed] the maximum penalty." *Flowal*, 234 F.3d at 936-37 n.2.[8]  Seemingly, then, the panel was headed toward a confirmation of Sixth Circuit precedent that *Apprendi* implicates only sentencing maximums.

At this point, however, *Flowal* takes an unexpected (and unwarranted) turn.  After all this discussion of sentencing maximums, the Court stated that *Apprendi* was violated in the case before it because "a finding as to the weight of the drugs determined the range of penalties that would apply to [the defendant]," and because the sentencing judge's "determination effectively limited the range of applicable penalties" by removing "any discretion in terms of imposing a shorter sentence" than life imprisonment.  234 F.3d at 936-37.  Remarkably, the panel claimed that its holding "reaffirm[ed] the logic of *Rebmann:*  a fact that increases the applicable statutory penalty range for a particular crime must be proved beyond a reasonable doubt to the trier of fact." 234 F.3d at 937 n.2.  As discussed earlier, however, neither *Rebmann*'s "logic" nor, more importantly, its express holding provides any authority for a broad "sentencing range" view of *Apprendi*.  In fact, neither *Flowal* nor *Rebmann* provided the

---

[8] *Flowal* misstates the facts in *Rebmann*, however, claiming that the defendant in that case was sentenced to life imprisonment.  In fact, as noted earlier, the challenged sentence in *Rebmann* was 24 years and 4 months, still beyond the default statutory maximum of 20 years.

### c. Drug Type Determination

Humphrey argues that the district court erred by failing to instruct the jury to return a special verdict on the drug type for which he was criminally responsible.  He maintains that where, as here, a defendant is charged with a multiple-drug conspiracy for which the maximum statutory penalty for each drug is different, and a jury returns only a general verdict of guilty, that defendant is entitled to be sentenced under the lesser statutory penalty.  This is particularly so in his case, Humphrey contends, because there was evidence that he distributed on separate occasions both powder cocaine and crack cocaine.

We reject Humphrey's argument that he was entitled to a special verdict. *See Olden v. United States*, 224 F.3d 561, 567 (6th Cir. 2000) (finding no entitlement to a special verdict because 21 U.S.C. § 841(a)(1) governs the distribution of "controlled substances," and where, as here, the drugs at issue are both proscribed controlled substances).  We further note that his reliance on *United States v. Dale*, 178 F.3d 429, 433 (6th Cir. 1999), is misplaced.  As we noted in *United States v. Neuhausser*, "*Dale* governs in cases where a jury's general verdict is ambiguous, such that it cannot be determined whether the jurors unanimously agreed as to one or another of the multiple drugs allegedly involved in a conspiracy." 241 F.3d 460, 470 (6th Cir. 2001).  While we recognize that the jury's general verdict in this case was ambiguous, we conclude that any error was harmless.  Unlike Humphrey, the defendants in *Dale* and *Neuhausser* were charged with conspiring to distribute cocaine (or crack cocaine) and marijuana, controlled substances subject to different statutory provisions and for which different penalty ranges are available.  Here, significantly, regardless of whether a jury determined that Humphrey conspired to distribute crack cocaine, powder cocaine, or both, he still would have been

subject to sentencing under § 841(b)(1)(C) and subject to the same statutory penalty.[3]

### D. Drug Quantity Determination / *Apprendi*

With respect to jury instructions, Humphrey makes a fourth argument -- that the district court violated the Supreme Court's decision in *Apprendi v. New Jersey* by failing to instruct the jury to find drug quantities beyond a reasonable doubt. Because of the complexity of this issue, and because we ultimately find this claim meritorious, we review this assignment of error separately.

### 1. Standard of Review

Our first task in evaluating Humphrey's *Apprendi* challenge is to determine the appropriate standard of review. Humphrey was sentenced in 1999, prior to *Apprendi*, and only made a formal *Apprendi* objection in his appellate brief in 2001. Because his appeal was pending at the time *Apprendi* was decided, Humphrey is entitled to retroactive application of a new rule of criminal prosecution. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). Where a defendant raises a cognizable *Apprendi* challenge in district court, and raises it again on appeal, we review the *Apprendi* issue de novo. *See United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001). If, however, a defendant fails to raise the issue in the district court, or abandons it on appeal, we review for plain error only. *See United States v. Graham*, 275 F.3d 490, 521 (6th Cir. 2001) (holding that a court may notice *Apprendi* errors *sua sponte* under plain error review, even if the issue is not

---

[3] This conclusion also renders moot Humphrey's other allegation, that the district court did not find by a preponderance of the evidence that he sold crack and not some other type of cocaine. As discussed in Part III.D. below, because Humphrey's sentence violates *Apprendi*, upon remand, Humphrey cannot be sentenced under any provision other than § 841 (b)(1)(C), which does not require a factual finding of any particular schedule I or II controlled substance.

the prior rulings in *Corrado* and *Rebmann* — had manifestly established as the law of this Circuit that *Apprendi* addresses only sentencing *maximums*. What is more, the majority is able to identify a line of Sixth Circuit cases in support of its conclusion. To fully appreciate the havoc these latter decisions have wreaked with the principle of *stare decisis,* and the chaotic state of our post-*Apprendi* law in the wake of these rulings, a brief history of the wayward journey is in order.

The trouble began in *United States v. Flowal*, 234 F.3d 932 (6th Cir. 2000), which was decided after *Page* and *Munoz* but mentions neither. In *Flowal*, the defendant was convicted by a jury of possession with intent to distribute cocaine, and the District Court found at sentencing that this offense involved more than 5 kilograms of cocaine, triggering the elevated sentencing range found at § 841(a)(1)(A). Moreover, in light of the defendant's two prior felony convictions for drug offenses, he was subject to mandatory life imprisonment under § 841(a)(1)(A), and the District Court imposed this sentence. The panel need not have looked any further than *Page* — or even *Rebmann*, which *Flowal* does cite — to find that this sentence violated *Apprendi*. In particular, the defendant's life sentence exceeded the maximum 30-year term of imprisonment he faced under § 841(b)(1)(C) as a prior drug felon whose latest offense, as determined solely by the jury's verdict, involved an indeterminate amount of cocaine.[7]

Notwithstanding this readily discernible outcome under this Circuit's own post-*Apprendi* precedents, the panel in *Flowal* deemed it necessary to interpret *Apprendi* anew. Its analysis, unfortunately, is anything but clear. First, upon reviewing

---

[7] Despite this *Apprendi* violation, the Government argued that the defendant's sentence could be upheld as within the range set forth in § 841(b)(1)(B), ten years to life, in light of the defendant's admission to a quantity of cocaine just under 5 kilograms. The panel in *Flowal* rejected this argument, without ever stating the standard of review that governed its consideration. This additional defect in *Flowal* is discussed below.

charged Defendant/Appellant Montel Humphrey and several co-Defendants with three counts of conspiring to distribute and to possess with intent to distribute a "detectable amount" of cocaine and/or cocaine base (crack), (*see* J.A. at 589, 594, 597), as well as other offenses. The jury returned a guilty verdict on two of the three conspiracy counts,[4] but did not determine the quantities of drugs chargeable to Defendant in connection with these drug offenses. Instead, the District Court determined at sentencing that Defendant was accountable for at least 50 but less than 150 kilograms of cocaine, resulting in a base offense level of 36 under the U.S. Sentencing Guidelines, and triggering the enhanced sentencing range of 10 years to life imprisonment under 21 U.S.C. § 841(b)(1)(A) for drug offenses involving 5 kilograms or more of cocaine.[5] In the end, however, Defendant was sentenced to a term of 20 years' imprisonment, which, as noted in *Page*, does not exceed the 20-year maximum set forth in § 841(b)(1)(C) for drug offenses involving an indeterminate amount of cocaine.[6] Under *Page* and *Munoz*, then, Defendant's sentence does not violate the rule of *Apprendi*.

The majority recognizes as much, albeit without citing *Page*. Problematically, however, the majority goes on to hold that Defendant's sentence violates a *second* "rule" of *Apprendi*, one which implicates sentencing *ranges*, even though our decisions in *Page* and *Munoz* — not to mention

---

[4]The third charge of conspiracy was dismissed before trial.

[5]This range becomes 20 years to life imprisonment if, as is the case here, a defendant previously has been convicted of a felony drug offense. *See* 21 U.S.C. § 841(b)(1)(A). The majority holds, and I agree, that Defendant's challenge to his prior conviction is without merit.

[6]In fact, this statutory maximum increases to 30 years where, as here, the defendant has a prior conviction for a felony drug offense. *See* 21 U.S.C. § 841(b)(1)(C). Thus, Defendant's 20-year sentence actually is well below the statutory maximum, even when drug quantities are omitted from the determination.

raised on appeal by the defendant); *see also United States v. King*, 272 F.3d 366, 374 (6th Cir. 2001).

In his written objections to the presentence report, Humphrey's lawyer stated:

> To find Humphrey guilty of conspiracy, all the jury needed to find was that there was an agreement as to at least one sale of cocaine. Although the jury found that a conspiracy existed, there is no basis to gather from the jury's verdict that it believed Eaton's 3-5 kilogram estimate to be accurate, or that it even believed that multiple sales between Eaton and Humphrey actually took place. Therefore, as a result of the lack of sufficient credibility regarding Eaton's testimony as to the amount of cocaine transacted, Defendant Humphrey suggests the Court reject the recommendation stated in the PSR as to the relevant conduct in Count II and instead adopt the minimum amount which the jury must have necessarily found to support its verdict of guilty, specifically, 1/4 kilogram of cocaine, which constitutes the lowest amount of cocaine purchased by Eaton during a given sale.

J.A. at 686-87.

He continues in the written objections, stating:

> As with Eaton, the only thing we can be sure of with regards to Cromity's testimony is that the jury found that an agreement did exist to purchase cocaine. As there is insufficient evidence to support an amount of cocaine higher than that which the jury must necessarily have found to support Humphrey's conviction, Defendant requests that the Court reject the PSR's recommendation regarding relevant conduct and that the Court instead hold Humphrey accountable in Count 1 for the sale of ½ kilogram of powder cocaine – a quantity which represents the minimum amount which Cromity indicated he had purchased from Humphrey.

J.A. at 689-90.

At the sentencing colloquy, Humphrey's attorney reiterated his objections and made the following request:

> If the Court finds, as we would ask the Court to do, that the total relevant conduct is less than five kilos, it would be a ten-year mandatory sentence, and I would ask the Court to consider that this is a – this is ten years of a man's life, perhaps more under the guideline calculations, maybe as much as 20 years of a man's life that's going to be decided by the testimony of these individuals [Eaton and Cromity]. And the testimony simply, while it may have been enough, it may have been enough to a jury to say clearly there was an agreement, perhaps an ongoing agreement for a certain period of time between Mr. Humphrey and Mr. Cromity in one count and Mr. Humphrey and Mr. Eaton in another count to distribute cocaine, that's all the jury had to believe beyond a reasonable doubt, was that there was such an agreement[.] [T]hey didn't even have to believe a transaction took place.
> The only cooperation [sic] that existed for their testimony were certain tapes and certain phone calls, but they don't corroborate this whole amount of drugs the Government's trying to put into play here at sentencing.
>     . . . .
> And I would ask the Court that – to apply perhaps a higher standard to the type of . . . relevant conduct, whatever you want to call it, in this case . . . . And if it does that, it will find the Government's not met its burden, and it will impose a mandatory minimum sentence based on a quantity of less than five kilos and a guideline sentence based upon that same quantity.

J.A. at 466-67.

Humphrey could not have known at the time of his sentencing that *Apprendi* would be decided a year later. Nevertheless, Humphrey objected at the sentencing hearing to

> [I]n the present case, defendant's sentence is invalid under *Apprendi* **only if** the district court's finding that defendant conspired to distribute methamphetamine resulted in defendant receiving a sentence in excess of the maximum statutory penalty for conspiracy to distribute cocaine, the crime to which defendant pled guilty.
>
> This case involves 126.7 grams of cocaine and 804.8 grams of either amphetamine o[r] methamphetamine. Title 21, U.S.C. § 846 provides that the penalty for conspiracy to distribute any drug will be identical to the penalties for distribution. Under 21 U.S.C. § 841(b)(1)(C), the statutory penalty for distribution of 126.7 grams of cocaine ranges from zero to twenty years imprisonment. The statutory penalty for distribution of 804.8 grams of methamphetamine, under 21 U.S.C. § 841(b)(1)(B), is five to forty years imprisonment. The statutory penalty for distribution of 804.8 grams of amphetamine, a Schedule II drug, is zero to twenty years, under 21 U.S.C. § 841(b)(1)(C). Defendant pled guilty to conspiracy to deliver the specified amount of cocaine. For the cocaine alone, the statute authorizes a maximum sentence of twenty years. Defendant was actually sentenced to serve 121 months, approximately ten years. Defendant's sentence did not exceed the statutory maximum for the portion of the indictment to which he validly pled guilty. The sentencing judge's determination by a preponderance of the evidence that defendant conspired to distribute methamphetamine, rather than amphetamine, did not increase his penalty beyond the prescribed statutory maximum for conspiracy to distribute 126.7 grams of cocaine. **Thus, the *Apprendi* ruling is not applicable here and does not impact defendant's sentence.**

233 F.3d at 413-14 (emphasis added) (footnote omitted).

The above-quoted passages from *Page* and *Munoz* could be repeated verbatim in this case. The superseding indictment

of drugs for which each defendant was accountable. Based on this drug quantity determination, each defendant was sentenced to a term of imprisonment exceeding the 20 year maximum set forth in § 841(b)(1)(C). However, as instructed in *Apprendi*, a defendant may not be exposed to a greater punishment than that authorized by the jury's guilty verdict. The jury merely found that defendants conspired to distribute and possess to distribute some undetermined amount of crack cocaine. As such, defendants cannot be subjected to the higher penalties under § 841(a)(1)(A) or (B). Rather, the maximum sentence that may be imposed on this count is 20 years pursuant to § 841(b)(1)(C).

232 F.3d at 543. Because each of the defendants in *Page* was sentenced to a term of imprisonment in excess of 20 years, we held that *Apprendi* had been violated.[3]

We applied this same rule a fourth time in *United States v. Munoz*, 233 F.3d 410 (6th Cir. 2000), a case where, in contrast to *Page*, the defendant's sentence did *not* exceed the default 20-year maximum under § 841(b)(1)(C). Defendant Zaferino Munoz pled guilty to a single count of conspiracy to distribute cocaine and methamphetamine, but "with the explicit reservation that he did not admit to conspiring to deliver methamphetamine but only admitted to the cocaine and amphetamine that was actually delivered." *Munoz*, 233 F.3d at 411. The District Court then imposed a 121-month sentence, "based in part on his conclusion that defendant did conspire to distribute methamphetamine." 233 F.3d at 411. We recognized that this determination by a preponderance of the evidence triggered an enhanced statutory sentencing range, both minimum and maximum, but nevertheless followed *Corrado* in concluding that the rule of *Apprendi* had not been violated:

---

[3]Nevertheless, as discussed below, we upheld the sentences of three of the four defendants under the "plain error" standard of review, "since, absent the [*Apprendi*] error, their sentences would have been the same as those which were imposed." 232 F.3d at 545.

both the amount of drugs attributed to him and the standard of proof required to support that amount. He reiterated this objection as a formal *Apprendi* objection on appeal.

The dissent dismisses these passages from the record as mere "factual challenges" to the drug quantity recommendations in the presentence report. The dissent charges that, absent some specific challenge to the district court's *authority* to find drug amounts by a preponderance of the evidence, we may review Humphrey's *Apprendi* challenge for plain error only.

We disagree. The preservation of a constitutional right is not a parlor game. Defendants should not be required, on penalty of forfeiture, to guess not only which substantial right will be impacted by a pending Supreme Court decision, but also which precise sequence of words will be necessary to preserve that right on appeal.[4] Neither do we find the Federal Rules of Criminal Procedure or precedent to require such a standard.

Rule 51 of the Federal Rules of Criminal Procedure states:

Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which that party desires the court to take or that party's objection to the action of the court and the grounds therefor; but if a party has no opportunity to object to a ruling or order, the

---

[4]Indeed, we believe too high a hurdle for de novo review will raise the specter of defendant's counsel "making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent," *Johnson v. United States*, 520 U.S. 461, 468 (1997), in order to preserve the issue for appeal. Although the *Johnson* decision concerned the timing of plain error (whether an error must be plain at the time of trial or at the time of appellate consideration), we believe that similar concerns arise in the preservation of de novo review.

absence of an objection does not thereafter prejudice that party.

We agree with the Second Circuit, that "[T]o communicate the 'nature' of a claim, a party does not have to present precise or detailed legal arguments." *United States v. Sprei*, 145 F.3d 528, 533 (2d Cir. 1998) (internal quotation marks omitted). All that is required is that the party "make[] known to the court the action which that party desires the court to take or that party's objection to the action of the court and the grounds therefor." Fed. R. Crim. P. 51; *cf. Cool v. United States*, 409 U.S. 100, 101 n.2 (1972) (noting that a defense objection to jury instructions, while not a "model of clarity" was sufficient to preserve the objection on appeal); *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1312 (11th Cir. 2000) (holding that an objection as to "foundation" of evidence sufficient to preserve a *Daubert* objection on appeal).

Humphrey's attorney may have conceded that, under then-current law, it was within the district court's authority to find drug quantities using the preponderance of the evidence standard; nevertheless, it is apparent from the record that Humphrey's attorney challenged the propriety of that standard. Although Humphrey's attorney articulated his objection on the basis of sufficiency of the evidence, he urged the district court to consider only those facts that were proved to a jury beyond a reasonable doubt. The district court implicitly acknowledged the objection during the sentencing colloquy, stating:

> This Court finds by a preponderance of the evidence that the quantity of drugs that is reasonably foreseeable in furtherance of the jointly undertaken criminal activity is at least 50 but less than 150 kilograms of cocaine.
> The Defendant's argument goes directly to the credibility of Eaton and Cromity. Basically, the argument is they are not reliable and cannot be believed. *Although, the jury in this case was not called upon to*

sentencing range of 20 years to life and an actual sentence of 24 years and 4 months. Upon reviewing *Apprendi*, we stated that "[o]ur duty, in light of this clear dictate from the Court, is to examine whether the sentencing factor in this case was a factual determination, and whether that determination increased the maximum penalty for the crime charged in the indictment." 226 F.3d at 524. Because the District Court's factual finding at sentencing had "increase[d] the maximum penalty to which [the defendant] was exposed," we held that this was an "element[] of the offense which must be proven beyond a reasonable doubt," and we remanded for a redetermination of this question under the proper standard of proof. 226 F.3d at 525.

More to the point of the present appeal, we reached the same conclusion in *United States v. Page*, 232 F.3d 536, 542-45 (6th Cir. 2000), a case which, like this one, involved a challenge to the sentencing court's determination of drug quantity by a preponderance of the evidence following a jury conviction on a drug conspiracy charge. After examining *Apprendi* and *Rebmann*, we stated:

> The Court finds the principles set forth in *Apprendi* applicable to defendants' cases. In count one of the indictment, defendants were charged with conspiracy to distribute and possess with the intent to distribute crack cocaine. There is no mention of quantity in the indictment and the jury made no findings regarding quantity. Pursuant to the provisions of [21 U.S.C.] § 841, the quantity of drugs is a factual determination that significantly impacts the sentence imposed. Section 841(b)(1)(C) provides for a maximum penalty of 20 years unless the crime involves a quantity of drugs as set forth in subsections (A) or (B). These subsections provide for a maximum penalty of 40 years if the crime involved 5 grams or more of crack cocaine, *see* § 841(b)(1)(B), and a maximum penalty of life imprisonment if the crime involved 50 grams or more of crack cocaine, *see* § 841(b)(1)(A). The district judge found, by a preponderance of the evidence, the quantity

maximum sentence beyond the statutory range authorized by the jury's verdict.").[2]

More importantly, our *own* Circuit immediately adopted the "statutory maximum" interpretation of *Apprendi*. In our very first post-*Apprendi* decision, *United States v. Corrado*, 227 F.3d 528, 541-42 (6th Cir. 2000), we confronted a case in which the defendants' sentences for a RICO conspiracy were based in part upon the District Court's finding that a murder plot was one of the objects of this conspiracy, but the jury's general verdict did not indicate whether it had reached this same factual conclusion. Despite the sentencing implications of the District Court's factfinding, under a preponderance of the evidence standard, we found no violation of *Apprendi*:

> In this case, [the defendants] faced a maximum sentence of twenty years on the RICO conspiracy counts, disregarding the murder conspiracy. Because the district court did not sentence either defendant to a term of more than twenty years on the RICO counts, *Apprendi* is not triggered and the existence of a murder conspiracy did not have to be decided by a jury under the reasonable doubt standard.

227 F.3d at 542 (citation omitted).

Soon thereafter, we considered *Apprendi* at length, and again found that it addressed *maximum* penalties. In *United States v. Rebmann*, 226 F.3d 521, 522 (6th Cir. 2000), the defendant pled guilty to heroin distribution, an offense with a maximum sentence of 20 years, but the District Court found at sentencing, by a preponderance of the evidence, that a death had resulted from this distribution, leading to a statutory

---

[2]The D.C. Circuit apparently has not squarely addressed the application of *Apprendi* to *statutory* sentencing ranges, but has held, with regard to sentencing enhancements under the U.S. Sentencing Guidelines, that "*Apprendi* does not apply to sentencing findings that elevate a defendant's sentence *within* the applicable statutory limits." *United States v. Fields*, 251 F.3d 1041, 1043 (D.C. Cir. 2001).

> *determine quantity of cocaine or crack, the jury was called upon to pass on the credibility of the witnesses.*

J.A. at 482-83 (emphasis added).

The dissent emphatically cites *United States v. Page*, 232 F.3d 536 (6th Cir. 2000), as foreclosing de novo review unless the defendant expressly challenges the district court's authority to determine drug quantities. However, such a formal objection requirement ignores the fact that *Apprendi* was decided upon *both* the Sixth Amendment jury and notice provisions *and* the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Apprendi*, 530 U.S. at 476 ("At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without due process of law, *and* the guarantee that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." (emphasis added) (internal quotation marks and citations omitted)). The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Although related, the Sixth Amendment right to trial by jury and the due process right to be convicted by evidence beyond a reasonable doubt are independent legal entitlements. *See Apodaca v. Oregon*, 406 U.S. 404, 411 (1972) ("We are quite sure . . . that the Sixth Amendment itself has never been held to require proof beyond a reasonable doubt in criminal cases. The reasonable-doubt standard developed separately from both the jury trial and the unanimous verdict."). In fact, we confirmed this point in *United States v. Rebmann*, 226 F.3d 521 (6th Cir. 2000), when we found that a defendant who had waived her right to a trial by jury "did not waive the right to have a court decide any remaining elements of the offense beyond a reasonable doubt." *Id.* at 524.

The preservation of a constitutional objection should not rest on magic words; it suffices that the district court be apprised of the objection and offered an opportunity to correct

it. Humphrey's attorney never formed the words "Apprendi," but we find the substance of his objection to the drug quantity determination, combined with his objection to the standard of evidence to be used, sufficient to notify the district court of the basis for the objection, and sufficient to preserve the issue for de novo review on appeal. *See Strayhorn*, 250 F.3d at 467 ("Although [the defendant] did not utter the words 'due process' at either [the plea or sentencing hearing], he made it well known that he disputed the district court's factual finding with respect to drug quantity."); *United States v. Stokes*, 261 F.3d 496, 498-99 (4th Cir. 2001) (finding the *Apprendi* issue preserved for harmless error review where a defendant objected to jury instructions that allowed conviction for any "measurable amount" of drugs rather than the indicted amount); *United States v. McCulligan*, 256 F.3d 97, 101 (3d Cir. 2001) (holding that where a jury's finding fit the definition of one crime and not another, and the defendant argued that he should be sentenced under the correct statutory maximum, "intonation of the word 'Apprendi' is unnecessary" to preserve the issue for appeal).

Furthermore, *Page* can be distinguished. In *Page,* we found that defendants who raised their *Apprendi* challenge for the first time on appeal were entitled only to plain error review of their claims. *Id.* at 543. Contrary to the dissent's effort to wrench every ounce of inference from that case, however, nothing in *Page* indicates what type of objection -- if any -- the defendants registered in the district court. *Page* may have addressed the standard of review applicable when a party fails to object in the district court, but *Page* offers no guidance as to what type of objection is sufficient to preserve an *Apprendi* challenge on appeal.[5]

---

[5] The dissent abstracts one line from that opinion, "Defendants . . . failed to object to the district judge making the determination of drug quantities," *Page*, 232 F.3d at 543, as proof that *Page* requires a specific objection to the judge's authority. This is at best a weak form of the familiar maxim *inclusio unius est exclusio alterius* ("the inclusion of one is the exclusion of the other"). (The dissent's citation to *United States v. Neuhausser*, 241 F.3d 460 (6th Cir. 2001) is merely another example of

"*Apprendi* has no application here," as it "dealt with the consideration of facts in sentencing enhancement beyond the statutory *maximum,*" while, "[i]n the instant case, the sentence imposed was . . . *below* the statutory maximum"); *United States v. Williams*, 238 F.3d 871, 877 (7th Cir. 2001) ("[W]hen a defendant is sentenced to a term of imprisonment within the statutory maximum for the crime of which he was convicted, *Apprendi* is beside the point." (internal quotations and citation omitted)); *United States v. Baltas*, 236 F.3d 27, 41 (1st Cir. 2001) ("The rule in *Apprendi* only applies in situations where the judge-made factual determination increases the maximum sentence beyond the statutory maximum, and not in situations where the Defendant's potential exposure is increased within the statutory range."); *United States v. Williams*, 235 F.3d 858, 863 (3d Cir. 2000) ("[T]hough the District Court's finding regarding the amount of drugs substantially increased the possible statutory maximum sentence under 21 U.S.C. § 841(b)(1), we hold that *Apprendi* is not applicable to [the defendant's] sentence, because the sentence actually imposed . . . was well under the original statutory maximum of 20 years."); *United States v. Hishaw*, 235 F.3d 565, 577 (10th Cir. 2000) ("[A]s long as the defendant's sentence falls within the maximum established by statute, *Apprendi* does not foreclose consideration of drug quantities beyond the offense of conviction."); *United States v. Keith*, 230 F.3d 784, 787 (5th Cir. 2000) (holding that because the defendant's "sentence did not exceed the maximum sentence of thirty years under [21 U.S.C.] § 841(b)(1)(C), the offense established by the jury's verdict, it does not run afoul of *Apprendi's* constitutional limitations"); *United States v. Rogers*, 228 F.3d 1318, 1327 (11th Cir. 2000) ("Applying *Apprendi's* constitutional principle to section 841 cases, it is clear that the principle is violated if a defendant is sentenced to a greater sentence than the statutory maximum based upon the quantity of drugs, if such quantity is determined by the sentencing judge rather than the trial jury."); *United States v. Aguayo-Delgado*, 220 F.3d 926, 933 (8th Cir. 2000) ("The rule of *Apprendi* only applies where the non-jury factual determination increases the

majority's standard by establishing an elevated statutory maximum for a collection of previously separate (and separately punishable) offenses, and then defining a variety of sentencing factors, found by the judge by a preponderance of the evidence, that would more specifically determine a defendant's sentence within this expanded statutory range. *See* 530 U.S. at 539-40, 120 S. Ct. at 2389 (O'Connor, J., concurring). Tellingly, the Court did *not* deny that such a scheme would pass constitutional muster, but instead conceded that "a State could, hypothetically, undertake to revise its entire criminal code in the manner the dissent suggests — extending all statutory maximum sentences to, for example, 50 years and giving judges guided discretion as to a few specially selected factors within that range." 530 U.S. at 490 n. 16, 120 S. Ct. at 2363 n.16. Nevertheless, the Court dismissed this possibility as "remote" because, "[a]mong other reasons, structural democratic constraints exist to discourage legislatures from enacting penal statutes that expose *every* defendant convicted of, for example, weapons possession, to a maximum sentence exceeding that which is, in the legislature's judgment, generally proportional to the crime." 530 U.S. at 490 n.16, 120 S. Ct. at 2363 n.16.

All of this is compelling evidence that the rule of *Apprendi* implicates only sentencing maximums, and not sentencing ranges generally. Further, as noted, each and every one of our sister Circuits that has addressed the question — in all, ten of the eleven other Circuits — has arrived at this conclusion. *See United States v. Harris*, 243 F.3d 806, 809 (4th Cir. 2001) ("While the Supreme Court may certainly overrule *McMillan* in the future and apply *Apprendi* to any factor that increases the minimum sentence or "range" of punishment, rather than only the maximum punishment, that is not our role." (citations omitted)); *United States v. White*, 240 F.3d 127, 136 (2d Cir. 2001) ("[W]e read [*Apprendi*] to apply only when a sentencing court's findings increase the penalty faced by the defendant above the statutory maximum for a given count, and not when they merely affect the length of a sentence within the statutory range."); *United States v. Garcia-Sanchez*, 238 F.3d 1200, 1201 (9th Cir. 2001) (finding that

Indeed, the first such case in our Circuit to address whether an objection to the quantity of drugs attributed to a defendant is sufficient to preserve the *Apprendi* error is our opinion in *Strayhorn*, which held that it was sufficient. *See Strayhorn*, 250 F.3d at 467. The dissent is correct that several of our sister circuits have adopted a different approach, and have held that factual challenges to the calculation of drug amounts in the district court, by itself, may be insufficient to preserve the *Apprendi* issue on appeal. *See, e.g.*, *United States v. Candelario*, 240 F.3d 1300, 1304 (11th Cir. 2001) (stating that "[a] defendant's objection to the quantity of drugs that the Government attributes to him is not, on its own, a constitutional objection"), *cert. denied*, 121 S.Ct. 2535 (2001). However, it is by no means clear that this rationale is consistently applied. *See United States v. Vazquez*, 271 F.3d 93, 96 (3d Cir. 2001) (applying plain error review because the defendant did not "contest the *drug quantity evidence* at any stage of the proceedings" (emphasis added)).

In any event, notwithstanding the binding effect of *Strayhorn*, even under a more rigorous requirement for an objection, it is plain that Humphrey preserved the *Apprendi*

---

this *inclusio* argument.) But, as the District of Columbia Circuit has wisely noted, "[t]he maxim's force in particular situations depends entirely on context, whether or not the draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives." *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998). Given that the record in *Page* is devoid of any reference to the form of the objection in the district court, and given that it is a panel of judges and not a legislature we are interpreting, we do not agree that it is reasonable to assume that the *Page* court intended to narrow so severely the form of a cognizable *Apprendi* objection.

The dissent's reliance on *Johnson v. United States* is erroneous for a similar reason. *Johnson* did not indicate whether the defendant raised an objection in the district court; *Johnson* only notes that the defendant herself insisted that the district court commit the error. 520 U.S. at 464-66. Moreover, *Johnson* can be distinguished from the present case because Humphrey clearly objected to the evidentiary standard to be used, a legal entitlement separate from the right to a jury. *Cf. Rebmann*, 226 F.3d at 524.

error in the district court. *See Candelario*, 240 F.3d at 1304 (indicating that a defendant who objects to the preponderance of evidence standard for drug quantity calculations preserves the *Apprendi* challenge for appeal); *cf. United States v. Buckland*, 277 F.3d 1173, 1178 (9th Cir. 2002) (applying plain error because the defendant did not object to the district court's use of the preponderance of the evidence standard for determining drug quantity).

Having determined that de novo review governs this appeal, we proceed to the merits of the challenge.

## 2.  Analysis

Humphrey argues that the quantity of drugs attributable to him as relevant conduct is an element of the offense that should properly have been submitted to the jury for determination beyond a reasonable doubt. The failure of the jury to make such a finding, he submits, violated the Supreme Court's decision in *Apprendi*, and requires resentencing. The consequence of this alleged violation, Humphrey maintains, is that he was subjected to an increased penalty for conduct not charged in the indictment based on the district court's finding by a preponderance of the evidence that he was responsible for 50-150 kilograms of cocaine. At oral argument, the Government conceded that the district court's sentencing of Humphrey offended *Apprendi*, as construed by our decision in *United States v. Ramirez*, 242 F.3d 348 (6th Cir. 2001). As our discussion below reveals, we too conclude that Humphrey has demonstrated an *Apprendi* violation that requires us to vacate his sentence and remand this case for resentencing.

The Supreme Court in *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Although Humphrey was indicted for and convicted of violations of 21 U.S.C. § 841(a)(1) and § 841 (b)(1)(A), the jury's failure to determine beyond a reasonable doubt the quantity of drugs for which Humphrey should be

No doubt a defendant could, under such a scheme, find himself sentenced to the same term to which he could have been sentenced absent the mandatory minimum. The range for his underlying crime could be 0 to 10 years, with the mandatory minimum of 5 years, and he could be sentenced to 7. (Of course, a similar scenario is possible with an increased maximum.) But it is equally true that his expected punishment has increased as a result of the narrowed range and that the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish. The mandatory minimum entitles the government to more than it would otherwise be entitled (5 to 10 years, rather than 0 to 10 and the risk of a sentence below 5). Thus, the fact triggering the mandatory minimum is part of the punishment sought to be inflicted; it undoubtedly enters into the punishment so as to aggravate it, and is an act to which the law affixes punishment. Further, . . . it is likely that the change in the range available to the judge affects his choice of sentence. Finally, in numerous cases . . . , the aggravating fact raised the whole range — both the top and bottom. Those courts, in holding that such a fact was an element, did not bother with any distinction between changes in the maximum and the minimum. What mattered was simply the overall increase in the punishment provided by law.

530 U.S. at 518, 521-22, 120 S. Ct. at 2378, 2379-80 (Thomas, J., concurring) (internal quotations with alterations and citations omitted). Plainly, Justice Thomas would not have deemed it necessary to advocate a "broader rule," encompassing whole sentencing *ranges* and not just maximums, if the majority had already adopted such a standard.

*Apprendi*'s limitation to statutory maximums is further confirmed by the majority's response to Justice O'Connor's suggestion that its holding "rests on a meaningless formalism," since a legislature seemingly could satisfy the

sentence which may be imposed within the statutory plan." 477 U.S. at 88, 106 S. Ct. at 2417 (footnote omitted).

Justice O'Connor insisted in her *Apprendi* dissent that "it is incumbent on the Court . . . to admit that it is overruling *McMillan*." *Apprendi*, 530 U.S. at 533, 120 S. Ct. at 2385 (O'Connor, J., dissenting).  In response, the *Apprendi* majority emphasized that "[w]e do not overrule *McMillan*." 530 U.S. at 487 n.13, 120 S. Ct. at 2361 n.13.  Rather, the Court stated that "[w]e limit [*McMillan*'s] holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict — a limitation identified in the *McMillan* opinion itself." 530 U.S. at 487 n.13, 120 S. Ct. at 2361 n.13. Thus, *Apprendi* and *McMillan*, read in tandem, plainly would permit a sentencing judge to find, by a preponderance of the evidence, facts which increase the *minimum* penalty faced by a defendant, so long as the judge's findings do not lead to the imposition of a sentence beyond the statutory *maximum* for the offense established by the jury's verdict alone.  This completely belies the broad, "alter the range" interpretation of the rule of *Apprendi*.

There are other indications within *Apprendi* itself that the majority did not adopt such a sweeping rule.  For example, Justice Thomas's concurrence *does* endorse something akin to the "alter the range" standard, in light of his "view that the Constitution requires a broader rule than the Court adopts." 530 U.S. at 499, 120 S. Ct. at 2367 (Thomas, J., concurring). Specifically, Justice Thomas opined that "a 'crime' includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)." 530 U.S. at 501, 120 S. Ct. at 2368 (Thomas, J., concurring).  Justice Thomas observed that the effect of his proposed rule upon the continuing vitality of *McMillan* "should be plain enough," but he then went on to explain that this rule would reach, and invalidate, "the *McMillan* situation of a mandatory minimum sentence" based upon a judge's findings by a preponderance of the evidence:

held responsible properly required him to be sentenced only under 21 U.S.C. § 841(b)(1)(C).  *See Ramirez*, 242 F.3d at 352.  Section 841(b)(1)(C) provides for a maximum penalty of twenty years except where, as here, a defendant has a prior felony drug conviction, in which case a defendant is subject to a thirty-year maximum statutory penalty. Because the district court's twenty-year sentence did not exceed the thirty-year maximum statutory penalty, on this basis alone, Humphrey can state no error.

Our *Apprendi* analysis, however, does not end with a finding that Humphrey's sentence did not exceed the prescribed statutory maximum penalty, as a defendant may nevertheless state an *Apprendi* violation where he can demonstrate that the district court's factual determination resulted in an increase of the range of statutory penalties applicable to the defendant for purposes of sentencing. *Cf. Apprendi*, 530 U.S. at 490 ("[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." (citation omitted)).  We have recognized that such a violation may be stated when a district court's drug quantity determination subjects a defendant to a mandatory-minimum term of imprisonment, which would not have been triggered but for the district court's findings.

In *United States v. Flowal*, we vacated the defendant's mandatory sentence of life imprisonment without the possibility of parole and remanded for resentencing where the district court's drug quantity finding alone rendered the defendant ineligible for a nonmandatory minimum sentence, observing that:

This difference [between possible penalties] is significant in this case because the trial judge's determination of the weight of the drugs took away any discretion in terms of imposing a shorter sentence.  It is not a foregone conclusion that the trial judge would have sentenced Flowal to life without the possibility of release if a jury had determined the drugs weighed 4.997 kilograms.  In

fact, if the jury had determined that the drugs weighed less than 500 grams, a life sentence would not have even been an option under 21 U.S.C. § 841(b)(1)(C). The judge's determination effectively limited the range of applicable penalties and deprived Flowal of the opportunity to receive less than life imprisonment without the possibility of release.

234 F.3d 932, 937 (6th Cir. 2000).

Likewise, in *Ramirez*, we vacated the defendant's twenty-year mandatory sentence under § 841(b)(1)(A) and remanded his case for resentencing where the applicable statutory penalty was determined exclusively by the district court's drug quantity finding. There, we observed that "[a]ggravating factors, other than a prior conviction, that increase the penalty from a nonmandatory minimum sentence to a mandatory minimum sentence, or from a lesser to a greater minimum sentence, are now elements of the crime to be charged and proved." *Ramirez*, 242 F.3d at 351-52. The failure of the jury to determine beyond a reasonable doubt the quantity of drugs for which Ramirez was criminally responsible where the Government had neither charged nor sought to prove to the jury a drug quantity sufficient to trigger a mandatory minimum sentence, we concluded, required him to be sentenced under § 841(b)(1)(C).

In *United States v. Strayhorn*, we again vacated a defendant's sentence and remanded his case for resentencing after a district court's attribution of 414 pounds of marijuana to the defendant resulted in a ten-year mandatory minimum sentence under § 841(b)(1)(B). Significant to this case, the indictment in *Strayhorn*, like those at issue in *Flowal* and *Ramirez*, failed to specify the quantity of drugs for which the Government sought to hold the defendant criminally responsible. In setting aside Strayhorn's sentence, we observed that:

Under *Ramirez*, if the government seeks to convict and sentence Strayhorn under § 841(b)(1)(B) for conspiracy to possess more than 100 kilograms of marijuana, it must

proved beyond a reasonable doubt only if that fact, as a formal matter, extends the range of punishment *beyond the prescribed statutory maximum*," or (ii) "the Constitution requires that a fact be submitted to a jury and proved beyond a reasonable doubt if it, as a formal matter, *increases* the range of punishment *beyond that which could legally be imposed absent that fact*." 530 U.S. at 540-41, 120 S. Ct. at 2389-90 (O'Connor, J., dissenting). Finally, the Court's initial statement of its holding could be construed as a constitutional command that a defendant's *actual sentence* not exceed the prescribed statutory maximum for the offense established by the jury's verdict.

While all of these readings (and perhaps more) enjoy some degree of support in the brute text of the *Apprendi* decision, there is ample reason to reject the broadest of these interpretations — *i.e.,* that facts which alter the *range* of penalties must be proved to a jury beyond a reasonable doubt. Most significantly, we know that the Supreme Court did not intend this result in *Apprendi*, because it expressly declined to overturn a prior decision, *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411 (1986), which is diametrically at odds with this expansive reading. In *McMillan*, the Court rejected due process and Sixth Amendment challenges to Pennsylvania's Mandatory Minimum Sentencing Act, under which "anyone convicted of certain enumerated felonies is subject to a mandatory minimum sentence of five years' imprisonment if the sentencing judge finds, by a preponderance of the evidence, that the person 'visibly possessed a firearm' during the commission of the offense." *McMillan*, 477 U.S. at 81, 106 S. Ct. at 2413. In so ruling, the Court observed that each of the enumerated felony offenses carried a maximum sentence of at least 10 years, and that the mandatory minimum statute did not alter these maximum penalties. 477 U.S. at 87-88, 106 S. Ct. at 2417. Instead, the Pennsylvania law "operate[d] solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm," and "'up[ped] the ante' for the defendant only by raising to five years the minimum

rules for the conduct of criminal prosecutions. I will discuss each of these points in turn.

First, it unfortunately is true that *Apprendi*'s central "holding" is stated in different ways. Indeed, the very paragraph in which the majority announces its conclusion includes two variants of "the rule" of *Apprendi*:

> In sum, our reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in *Jones* [*v. United States,* 526 U.S. 227, 119 S. Ct. 1215 (1999)]. Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in that case: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." 526 U.S., at 252-253, 119 S.Ct. 1215 (opinion of Stevens, J.); see also *id.,* at 253, 119 S.Ct. 1215 (opinion of Scalia, J.).

*Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63 (footnote omitted).

As observed in Justice O'Connor's dissent, these two formulations seem to embrace a variety of different "rules." First, by endorsing the statements in the concurring opinions in *Jones,* "the Court appears to hold that any fact that increases or alters *the range* of penalties to which a defendant is exposed — which, by definition, must include increases or alterations to either the minimum or maximum penalties — must be proved to a jury beyond a reasonable doubt." 530 U.S. at 533, 120 S. Ct. at 2385 (O'Connor, J., dissenting). Justice O'Connor then suggests two further "plausible interpretations" of the majority's holding: (i) "the Constitution requires that a fact be submitted to a jury and

indict him appropriately and then prove the elements of that offense beyond a reasonable doubt. Otherwise, the government may indict a defendant under the provision with the lowest statutory maximum sentence and then, as in this case, rely on relevant conduct findings to achieve what it otherwise might not if held to a higher burden of proof, namely a sentence under a separate offense's enhanced penalty provision.

250 F.3d at 470.

Consistent with our holdings in *Flowal*, *Ramirez*, and *Strayhorn*, we find that the district court violated *Apprendi* when it sentenced Humphrey to a mandatory sentence of 240 months. Although the district court properly found that Humphrey was subject to a Guidelines sentencing range of 235 to 293 months, it nevertheless erroneously believed that it was required to sentence Humphrey to a mandatory minimum sentence of 240 months, as provided for in § 841(b)(1)(A).[6] We recognize that *Ramirez* and *Strayhorn* are distinguishable inasmuch as those cases involved situations in which the statutory mandatory minimum imposed was equivalent to the statutory maximum; Humphrey, by contrast, was sentenced to a twenty-year mandatory minimum sentence under § 841(b)(1)(A), despite the fact that he should have been sentenced under

---

[6] The record reads as follows:

> THE COURT: This Court does in fact accept the findings and guideline applications contained in the presentence investigation report, with the exception that this Court will not afford a two-level enhancement for the gun. Therefore, we are looking at a criminal history category of 1, a total offense level of 38, which according to the guideline imprisonment range, we're looking at 235 to 293 months. However, we are in fact looking at a mandatory minimum of 240 months.

J.A. at 487.

§ 841(b)(1)(C), which provides for a *thirty-year* statutory maximum penalty.

A close inspection of *Flowal*, *Ramirez*, and *Strayhorn* reveals that such a distinction is of no consequence. The rationale underlying each of these panel's decisions was not that the mandatory minimum sentence of one provision was less than or equal to the statutory maximum of another, but a concern that the district court was compelled to issue a sentence that, but for its drug quantity determination, it would not have been obligated (or even permitted) to impose. *See Strayhorn*, 250 F.3d at 470 ("It matters not, according to *Ramirez*, that the statutory maximum for § 841(b)(1)(D) is equivalent to the statutory mandatory minimum for § 841(b)(1)(B)."); *Ramirez*, 242 F.3d at 351 (noting that the difference between a statutory maximum penalty and a mandatory-minimum penalty of the same length is significant because the trial judge's determination of the weight of the drugs "took away any discretion in terms of imposing a shorter sentence." (quoting *Flowal*, 234 F.3d at 937)).

Indeed, the district court in the instant case, even if it had been so inclined, would not have sentenced Humphrey to 235 months, the low end of the Guidelines sentencing range, because it believed that the twenty-year statutory mandatory minimum sentence set forth in § 841(b)(1)(A) removed its authority to do so. It is precisely this situation that we confronted in *Flowal*, *Ramirez*, and *Strayhorn* and that we concluded offended the rule of *Apprendi*. The jury in this case should have determined beyond a reasonable doubt the quantity of drugs for which Humphrey was criminally responsible. In the absence of such a finding, the district court, consistent with our holding in *Ramirez*, properly should have sentenced Humphrey under § 841(b)(1)(C), which sets forth a thirty-year enhanced statutory maximum penalty, and significantly, no mandatory minimum term of imprisonment where, as here, no death or serious bodily injury has resulted from use of the substance. We accordingly vacate Humphrey's sentence and remand this case to permit the

a *de novo* standard that applies uniquely to such claims, regardless of whether they were raised before the District Court.

In resolving the *Apprendi* challenge in this case, the majority follows these latter panels, both in their strained reading of *Apprendi* and in their application of an improper standard of review. Accordingly, while I concur in the remainder of the majority's decision, I dissent from its ruling that this case be remanded for resentencing.

## I.

As indicated above, I have two principal concerns with elements of this Circuit's post-*Apprendi* jurisprudence. First, while, as Justice O'Connor aptly observed, the *Apprendi* majority stated several formulations of its ruling which are somewhat in tension with each other, it is incumbent upon us, nevertheless, to adopt and adhere to *one* of these formulations as the law of this Circuit. Instead, we, like the majority in *Apprendi*, have endorsed several different, and inconsistent, statements of "the rule" of *Apprendi*. To be sure, if *Apprendi* itself is ambiguous, there is little we can do to overcome this problem. Yet, I believe, and our sister Circuits concur, that any potential ambiguity is cured by reading *Apprendi* alongside the whole of Supreme Court precedent in the area of sentencing. I submit that the construction of *Apprendi* adopted in some of our cases, including by the majority here, cannot be squared with this body of law.

Second, given the questions that inevitably have arisen about the retroactive application of *Apprendi* to sentences imposed prior to that decision, we must be clear in establishing the standard of review that will govern *Apprendi* challenges at the various stages of criminal proceedings. Some of our decisions, however, do not even address the proper standard of review, and others, like the majority ruling here, are at odds with the governing Federal Rules of Criminal Procedure, Supreme Court precedent, and our many prior decisions in which we have applied newly-announced

By these decisions, our Circuit has realized the fears of the dissenters in *Apprendi*. Justice O'Connor, in particular, warned that the Court's opinion would have an "unsettling effect on sentencing conducted under current federal and state determinate-sentencing schemes," and that "the Court's decision threatens to unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or in part." 530 U.S. at 550-51, 120 S. Ct. at 2394-95 (O'Connor, J., dissenting).[1] This concern did not rest solely upon disagreement with the rule announced by the majority, but was based in part upon the "several formulations" through which the majority announced its ruling, leaving the lower courts "in a state of limbo" regarding the true scope of *Apprendi*. 530 U.S. at 533, 551, 120 S. Ct. at 2385, 2395 (O'Connor, J., dissenting).

Other Circuits, to their credit, have recognized but downplayed the "alarms sounded by the dissenters" in *Apprendi*, finding certain guideposts in the majority opinion and in related Supreme Court precedents that point unmistakably toward a narrow reading of that decision. *See, e.g., United States v. Garcia*, 240 F.3d 180, 183 (2d Cir. 2001); *United States v. Meshack*, 225 F.3d 556, 576 & n.17 (5th Cir. 2000). We, too, quickly adopted this narrow construction in our initial post-*Apprendi* cases. *See, e.g., United States v. Munoz*, 233 F.3d 410, 414 (6th Cir. 2000); *United States v. Page*, 232 F.3d 536, 542-45 (6th Cir. 2000); *United States v. Rebmann*, 226 F.3d 521, 524-25 (6th Cir. 2000). A handful of subsequent panels, however, seized upon *Apprendi*'s "several formulations" of its rule — and, in one especially unfortunate instance, relied upon a concurrence that decidedly lacked the support of a majority of the *Apprendi* Court — as an invitation to embrace a much broader reading. These same panels either failed to address the proper standard of review for *Apprendi* challenges, or cut out of whole cloth

---

[1] The subsequent case law in this and other Circuits confirms this forecast. By my count, in the Sixth Circuit alone, we have cited *Apprendi* in 33 published opinions, and 137 opinions overall, in the nineteen months since that case was decided.

district court an opportunity to resentence him within the appropriate Guidelines sentencing range.

This Court's recent decisions in *United States v. King* and *United States v. Garcia*, 252 F.3d 838 (6th Cir. 2001), both support and limit our holding today. *King* presents facts analogous to the case at bar. In *King*, two defendants were convicted by a jury and sentenced under the overlapping provisions of 21 U.S.C. § 841 for methamphetamine trafficking; in neither instance were the drug amounts specified in the indictment or submitted to the jury. One of the defendants was a prior felon and thus faced between zero and thirty years of imprisonment for trafficking in any detectible amount of drugs under § 841(b)(1)(C). He faced a maximum range of twenty years to life for possessing fifty grams or more of methamphetamine under § 841(b)(1)(A). The district judge found the defendant responsible for more than 300 grams but less than one kilogram of methamphetamine and sentenced him to 240 months (twenty years) of imprisonment and ten years of supervised release. As in the present case, the Government in *King* admitted at oral argument that the district court had erred under *Ramirez*. *King*, 272 F.3d at 375. This Court agreed, and found that the district court had erred because the district judge's finding and mandatory minimum sentence of twenty years had increased the prescribed range of penalties to which the defendant was exposed. *Id.* at 375, 378 (citing *Ramirez*, 242 F.3d at 350).[7]

However, in the very same case, this Court found no *Apprendi* violation where the other defendant's sentence under the Guidelines *exceeded but did not equal* the mandatory minimum of § 841(b)(1)(A), yet still remained within the statutory maximum of § 841(b)(1)(C). Like the first defendant, the second defendant was found by a

---

[7] Unlike the present case, the defendants in *King* had not preserved the error. 272 F.3d at 374. Using the plain error standard of review, this Court held that the error, though plain, was not reversible because it was not prejudicial. *See id.* at 380.

preponderance of the evidence to have trafficked in between 300 grams and one kilogram of methamphetamine. Because he had no prior convictions, he was exposed to a mandatory minimum of ten years and a maximum of life under § 841(b)(1)(A). With no amount specification, he would have faced no minimum and a maximum of twenty years under § 841(b)(1)(C). This second defendant was sentenced to 151 months (twelve years and seven months). Relying upon this Court's decision in *United States v. Garcia*, we found that the district court had not erred because the twelve years and seven months of imprisonment, while it exceeded the ten-year mandatory minimum of § 841(b)(1)(A), did not *equal* the ten-year minimum of the same provision. *See King*, 272 F.3d at 377-78.

While this result seems anomalous, it is dictated by a prior ruling. In *United States v. Garcia*, which *King* cited, the indictment did not specify a quantity of drugs. At allocution, the defendant explicitly admitted to only an amount of marijuana that carried a five- to forty-year sentence under § 841(b)(1)(B). Using the preponderance of the evidence standard, the district judge found that the defendant had possessed enough drugs to sentence him to a range of ten years to life under § 841(b)(1)(A). The judge sentenced the defendant under the Guidelines to eleven years and three months. Although the sentence exceeded the five-year minimum under § 841(b)(1)(B) (as well as the ten-year minimum of § 841(b)(1)(A)), this Court found no *Apprendi* violation because the sentence imposed -- eleven years and three months -- was *in excess of*, but not "at the bottom of the higher statutory range." *Garcia*, 252 F.3d at 843. Because the sentence did not equal the statutory minimum, "nothing indicate[d] that the district court thought itself constrained by a specific statute to impose the sentence it did." *Id.*

After *Garcia* and *King* we are left with an inordinately complicated *Apprendi* doctrine. Although it is obvious that the limitations placed upon *Ramirez* lead to peculiar results, we are constrained by the principle of *stare decisis* to abide by those decisions. *See Salmi v. Sec'y of Health & Human*

such claims *de novo,* even where, as here, a defendant has not remotely raised an *Apprendi* challenge before the District Court, but, to the contrary, has explicitly acknowledged at sentencing that the pre-*Apprendi* state of affairs still governed. Again, there is Sixth Circuit authority for the majority's position — but again, there is prior, competing authority, never overruled and still followed, which dictates that we apply plain error review under the circumstances presented here. As "tiebreakers," I again would point to unanimity among the other Circuits that the plain error standard should govern, plus, more importantly, direct Supreme Court precedent applying plain error review under legally indistinguishable circumstances — a ruling which plainly trumps any intra-circuit conflict.

Admittedly, this panel cannot singlehandedly unravel the conundrum of this Circuit's post-*Apprendi* law. The majority, to its credit, certainly tries to do so; indeed, I must confess a grudging admiration for its herculean effort to harmonize a body of law that it characterizes — charitably, in my view — as "inordinately complicated," (Majority Op. at 40), and as defying "formal logic," (*id.* at 42 n.8). The majority's effort, however, fails to assuage my fundamental concern that like cases are being decided differently — and that this case, in particular, is apparently governed by two distinct lines of published precedent that dictate two different outcomes. Under these circumstances, I believe that we are bound to follow this Circuit's *first*, clear, and unmistakable statement of the rule of *Apprendi* in its initial efforts to construe that decision. Instead, the majority elects to follow a *later* (and contrary) line of cases, thereby breathing new life into decisions of questionable pedigree. As a District Judge who must apply *Apprendi* in the first instance, I am especially troubled by this Circuit's failure to endorse a single "rule" of *Apprendi* in its decisions, by the hopeless jumble that instead presents itself as the "precedent" of this Court on this question, and by the havoc this state of affairs plays with any principled attempt to adhere to the cardinal rule of *stare decisis*.

## CONCURRING IN PART, DISSENTING IN PART

ROSEN, District Judge, concurring in part and dissenting in part. I concur in all but Part III, section D of the Court's decision. However, I respectfully dissent from the majority's determination that this case be remanded for resentencing under the authority of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). This ruling, in my view, joins the wrong side in an intra-circuit debate as to the proper construction of *Apprendi*. To be sure, there is Sixth Circuit authority for the position taken by the majority — but this is precisely the problem, because there *also* is authority for the narrower view I advocate, a *prior* series of cases which continue to be followed and have never been overruled. Subsequent panels, including this one, are bound to follow these initial post-*Apprendi* decisions, by the doctrine of *stare decisis,* by our Circuit rule embodying this principle, *see* Sixth Circuit Rule 206(c), and by our express recognition that "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case." *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001). If any additional "tiebreakers" were needed, I would suggest two: first, that the cases followed by the majority espouse a sweeping construction of *Apprendi* which is at odds with any tenable reading of that case, and second, that this broad reading has been rejected by all ten other Circuits that have considered the question, leaving our Circuit as an acknowledged "minority of one" on this point. *See United States v. Hill*, 252 F.3d 919, 921 (7th Cir. 2001).

The majority, in my view, then exacerbates the problem by following another set of Sixth Circuit decisions which confer special status on *Apprendi* claims, exempting them from the usual rule of waiver that is a bedrock principle of appellate law: namely, that an objection is forfeited, and hence subject only to plain error review, if not timely asserted before the trial court. Instead, the majority holds that we should review

*Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). It is also apparent that much of our current *Apprendi* jurisprudence, as it relates to mandatory minimums, rests upon what was in the mind of the district judge when she sentenced the defendant. Under our current doctrine, a district judge may sentence a defendant to a term of imprisonment which exceeds, but does not equal, the mandatory minimum of a higher penalty range without concern that such a sentence will raise an inference that she felt herself constrained by the mandatory minimum. *See Garcia*, 252 F.3d at 843. However, if evidence in the record indicates that the judge thought herself constrained to sentence the defendant within the higher statutory range, such evidence will demonstrate a potential *Apprendi* violation. *See Strayhorn*, 250 F.3d at 470. A penalty which exactly equals the bottom of the higher range is probative of such a perception of constraint. *See United States v. Stafford*, 258 F.3d 465, 479 n.9 (6th Cir. 2001).

We anticipate that this *Apprendi* cacophony soon will be harmonized by the Supreme Court. *See Harris v. United States*, No. 00-10666, 2001 WL 716327 (Dec. 10, 2001) (granting *certiorari* on the question of whether factual findings that result in an increased mandatory minimum sentence must be alleged in an indictment and proved beyond a reasonable doubt). In the meantime, we are called upon to decide cases in conformity with the law. While we recognize the frustration expressed in the dissent, we find its suggested resolution to this case wanting, both as a practical matter and as a matter of jurisprudence.

The dissent's argument relies on two interdependent assumptions: first, that our precedent in this area is not just complex, but fundamentally irreconcilable; second, that because it is irreconcilable, we are free to ignore some cases in favor of others. Neither of these assumptions can withstand scrutiny. As the dissent acknowledges, the Supreme Court's *Apprendi* decision offers more than one formulation of the test – one that appears to support a "statutory maximum" rule, and another that appears to support an "increased range" rule. Nevertheless, the dissent

faults this Court for failing to adhere to what it describes as a "statutory maximum" interpretation of *Apprendi*. The dissent extracts from our decisions in *United States v. Page* and *United States v. Munoz*, 233 F.3d 410 (6th Cir. 2000), among others, an exclusive "statutory maximum" interpretation of *Apprendi*. As with the standard of review, however, none of these decisions preclude a companion "increased range" rule that would cover mandatory minimums. *Page* held that *Apprendi* had been violated because the sentence exceeded the statutory maximum – it said nothing about *Apprendi*'s application to mandatory minimums. *Munoz* held that *Apprendi* had not been violated where a sentence did not exceed the statutory maximum, but again, we cannot infer from *Munoz* that the panel intended to endorse an exclusive "maximum only" rule.[8] The dissent argues that our decision in *Flowal* -- which was actually argued before *Munoz*, but decided two weeks afterward -- took an "unwarranted" turn from the "maximum only" rule of *Page* and *Munoz*. But there is nothing fundamentally irreconcilable about *Apprendi* protecting a defendant from a sentence that exceeds the statutory maximum *and* a sentence that increases the range of penalties by raising the mandatory minimum.[9] Cases should

---

[8] As a matter of formal logic, language in *Munoz* could be construed to exclude any *Apprendi* violation unless the district court's finding resulted in a defendant receiving a sentence in excess of the maximum statutory penalty. Such formalism, however, would inevitably lead to absurd results. For example, if a district court issued a sentence below the mandatory maximum using the reasonable doubt standard, but did so after having peremptorily dismissed the jury, there would be little question that a constitutional violation had occurred. Yet, such a case would be excluded from *Apprendi* consideration by the strict logic of *Munoz*. We cannot believe the *Page* court would have intended such a result. As one jurist noted: "A formal logic which reasons from precedent alone sometimes insulates the mind against the overwhelming logic of reality." *Klingenberg v. City of Raleigh*, 194 S.E. 297, 302 (N.C. 1937) (Clarkson, J., dissenting).

[9] The dissent attempts to fashion *Ramirez* as a usurper of *Munoz*, but its argument ignores the intervening decision in *Flowal*. Key to our decision in *Flowal* was the fact that "the trial judge's determination of the weight of the drugs took away any discretion in terms of imposing a

---

acknowledgment that they had been used to further his drug selling activities. Likewise, Cromity, a drug dealer with an even more extensive operation than Eaton's, entered into a plea agreement with the Government in exchange for his testimony, which resulted in a sentence of 108 months imprisonment (with a twelve month reduction for completion of a drug treatment program) to be served at a low security facility where his brother is also housed and which is less than two hours from his family and friends in Cleveland.

Humphrey reasons that if he had offered Eaton and Cromity something of value in exchange for their favorable testimony, he would have been subject to indictment for bribing a witness pursuant to 18 U.S.C. § 201(c)(2), so why then should the Government be allowed to do that which, if done by a private citizen, could result in criminal prosecution. His claim is foreclosed by our decision in *United States v. Ware*, in which we held that federal prosecutors are beyond the scope of 18 U.S.C. § 201(c)(2). 161 F.3d 414, 418-24 (6th Cir. 1998).

Also without merit is Humphrey's argument that the Government's use of Eaton's and Cromity's testimony violated Disciplinary Rule 7-109(C) of the Ohio Code of Professional Responsibility, which provides that "[a] lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case." He cites no authority, and we have found none, for the proposition that a plea agreement is barred by DR 7-109(C). We accordingly find no error.

### IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court on all claims, but **VACATE** Humphrey's sentence, and **REMAND** this case to the district court for resentencing.

are raised for the first time on appeal unless "the record is adequate to assess the merits of the defendant's allegations." *See United States v. Hill*, 30 F.3d 48, 51 (6th Cir. 1994). In explaining the basis for such a practice, we have observed:

> This rule stems from the fact that a finding of prejudice is a prerequisite to a claim for ineffective assistance of counsel, and appellate courts are not equipped to resolve factual issues. As a result, our court has routinely concluded that such claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue.

*United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997) (internal quotation marks and citations omitted).

We believe such a practice is particularly appropriate in this case where the record before us is inadequately developed to permit us to resolve the difficult and fact-intensive questions concerning whether Humphrey can establish the requisite prejudice stemming from the alleged deficiencies of his counsel.

### F. Plea Agreements

### 1. Standard of Review

We review a district court's admission of testimony and other evidence at trial for an abuse of discretion. *See United States v. Logan*, 250 F.3d 350, 366 (6th Cir. 2001).

### 2. Analysis

Humphrey submits that he was convicted on the basis of the purchased testimony of Eaton and Cromity. Specifically, in exchange for testimony against Humphrey, the Government entered into a plea agreement with Eaton, a major drug dealer, which resulted in Eaton's receipt of a sentence of fifty months imprisonment and which permitted him to maintain possession of two homes and three cars, despite his

be construed as to *avoid* intra-circuit conflicts, not to create them. *Cf., e.g., Hale v. Arizona*, 993 F.2d 1387, 1393 (9th Cir. 1993) (noting that for prudential reasons, a court avoids unnecessary conflicts with other circuits).

Nevertheless, the dissent insists that *Flowal* and its progeny have spawned a "line of cases parallel to, but at odds with, another distinct line of cases following the 'statutory maximum' rule of *Munoz*, *Page,* and *Rebmann*." This concept of a "parallel precedent" is nothing more than a bugbear. Nearly every case the dissent marshals to prove the existence of this "parallel precedent" is an unpublished decision with no binding effect. *See* 6th Cir. R. 28; *United States v. Ennenga*, 263 F.3d 499, 504 (6th Cir. 2001) (unpublished decisions are not controlling precedent); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828 (6th Cir. 2000) (same). On the contrary, as demonstrated in *King* and *Garcia* above, even those panels that have found no *Apprendi* error with respect to mandatory minimums have been bound by the principle of *stare decisis* to acknowledge or distinguish *Flowal*, *Strayhorn*, or *Ramirez. See, e.g., King*, 272 F.3d at 374; *United States v. Laster*, 258 F.3d 525, 531-32 (6th Cir. 2001); *Stafford*, 258 F.3d at 479 n.9; *Garcia*, 252 F.3d at 843.

It is axiomatic that a court of appeals must follow the precedent of prior panels within its own circuit. *See, e.g., FDIC v. Abraham*, 137 F.3d 264, 268-69 (5th Cir. 1998); *United States v. Hogan*, 986 F.2d 1364, 1368 (11th Cir. 1993); *Salmi*, 774 F.2d at 689; *In re Penn Central Transp.*

---

shorter sentence." 234 F.3d at 937. In *Ramirez,* we held *Apprendi* was violated because the trial judge was convinced that his drug quantity finding had taken away his discretion to sentence the defendant below a mandatory minimum of life imprisonment. *See Ramirez*, 242 F.3d at 350-51; *cf. Garcia*, 252 F.3d at 843. By contrast, *Munoz* never considered whether the judge thought that his discretion was constrained by a mandatory minimum, and there is nothing in the case to show that he perceived himself to be constrained. Because *Ramirez* demonstrated evidence of constraint, and *Munoz* contains no evidence of constraint, it is erroneous to claim that they are based on "legally indistinguishable facts."

*Co.*, 553 F.2d 12, 15 (3d Cir. 1977); *Doe v. Charleston Area Med. Ctr.*, 529 F.2d 638, 642 (4th Cir. 1975); *United States v. Olivares-Vega*, 495 F.2d 827, 829 (2d Cir. 1974); *see also* 6th Cir. R. 206(c). Yet the dissent invites us to believe that the principle of *stare decisis* obliges us to bifurcate our post-*Apprendi* jurisprudence into a "first" line of cases, which we must follow, and a "second" line of cases, which we are (presumably) free to ignore. Even if we were to agree with the dissent, and believe *Flowal* and its progeny to have been decided wrongly, we cannot condone the suggestion that we are at liberty simply to overlook these decisions. *See, e.g., Salmi*, 774 F.2d at 689 ("The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision."); *Ramirez*, 242 F.3d at 352 (Siler, J., concurring) (expressing doubt that *Apprendi* reaches mandatory minimums, but concurring in the decision because the panel could not overrule *Flowal*); *Davis v. Estelle*, 529 F.2d 437, 441 (5th Cir. 1976) ("One panel of this Court cannot disregard the precedent set by a prior panel, *even though it conceives error in the precedent*." (emphasis added)).

Ultimately, we are unsure of how the dissent would decide the substantive *Apprendi* claim in this case. The dissent urges this Court to consider *en banc* review. Request for *en banc* review is certainly the prerogative of any member of this Court, 6th Cir. R. 35, but *en banc* review is useless in helping us decide *this* case. The dissent proposes a "tie breaker" doctrine that would allow us to reach through *Flowal, Strayhorn,* and *Ramirez*, as if they were some type of judicial phantasm, and rely on *Page*. But this suggestion violates the very principle of *stare decisis* the dissent wishes to champion. Moreover, as *King* and *Garcia* demonstrate, this Court has already rejected such a strategy, opting to distinguish prior cases rather than to disregard them. While we sympathize with the dissent's frustration with the doctrine, *Page, Munoz, Flowal, Strayhorn*, and *Ramirez* all constitute the corpus of *Apprendi* jurisprudence in our Circuit. It is clear from *all* of the precedent in our Circuit that Humphrey's sentence

implicates the current "mandatory minimum" protections of our jurisprudence. Indeed, as noted before, the Government admitted as much in oral argument. It is equally clear that Humphrey's sentence was in error and that he is entitled to have his sentence vacated and remanded. The dissent may despair, but this is the law of the Circuit, and our duty is to decide this case according to the law.

### E. Ineffective Assistance of Counsel

#### 1. Standard of Review

We review de novo a defendant's claim that he was denied the effective assistance of counsel. *See Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir. 1992).

#### 2. Analysis

Humphrey contends that in four respects the performance of his counsel, David Dudley, fell below that required by the Sixth Amendment. First, as discussed above, in Part III.B.2.b., Dudley failed to raise a timely challenge to the Government's allegedly discriminatory use of its peremptory challenges to exclude two African-Americans from the jury. Second, as discussed above at Part III.B.2.a., Humphrey contends that Dudley's operation under a conflict of interest constituted per se ineffective assistance. Third, Dudley made no argument and presented no mitigation evidence in support of a downward departure. Finally, Dudley failed to object to: (1) the Government's improper "unexplained wealth" argument; (2) the Government's misuse of tax returns and IRS testimony; (3) the Government's improper arguments concerning "personal use" drug quantities; (4) the Government's improper argument concerning its belief in Humphrey's guilt; (5) the Government's discriminatory exercise of peremptory challenges; and (6) the district court's use of deficient jury instructions.

Because ineffective assistance of counsel claims are customarily the subject of a 28 U.S.C. § 2255 post-conviction proceeding, we generally decline to review those claims that